## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BENCHMARK RESOURCES )
CORPORATION, GENTRY )
CORPORATION, and SUNRISE ) No. 03-178L
HOLDING, INC., )
 ) Honorable Christine Odell Cook Miller
   Plaintiffs, )
 )
   v. )
 )
THE UNITED STATES OF AMERICA, )
 )
   Defendant. )
 )

---

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND....................................................................................................2

STANDARD OF REVIEW .......................................................................................................2

ARGUMENT ...........................................................................................................................3

I.    PLAINTIFFS' CLAIMS ARE RIPE ...............................................................................3

    A.    THE OSM DECISION PREVENTS PLAINTIFFS FROM MINING ANY
        PORTION OF THEIR PROPERTY; IT WOULD ACCORDINGLY BE FUTILE
        TO APPLY FOR A MINING PERMIT ...................................................................4

    B.    PLAINTIFFS PURSUED ADMINISTRATIVE REQUIREMENTS IN GOOD
        FAITH; DEFENDANT DID NOT ADVISE HOW ADMINISTRATIVE
        REMEDIES WERE TO BE EXHAUSTED................................................................7

II.   SANTIAGO'S CLAIMS ARE TIMELY ...........................................................................8

    A.    CLAIM ACCRUAL....................................................................................................9

    B.    MULLANE REMAINS THE CORRECT STANDARD FOR PURPOSES OF
        DETERMINING WHETHER NOTICE IS CONSTITUTIONAL AND PROPER..10

    C.    SANTIAGO DID NOT RECEIVE PROPER NOTICE ...........................................13

III.  PLAINTIFFS HAVE A COMPENSABLE PROPERTY INTEREST IN THE
    WHARTON TRACT .........................................................................................................16

CONCLUSION.......................................................................................................................19

## TABLE OF AUTHORITIES

## CASES

Alamo Land & Cattle Co. v. Arizona,
    424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976)................................................18

A.T.L., Inc. v. United States,
    736 F.2d 677 (Fed. Cir. 1984)............................................................................9

Cane Tennessee, Inc. v. United States,
    60 Fed. Cl. 694 (2004)......................................................................................19

Cienega Gardens v. U.S.,
    331 F.3d 1319 (Fed. Cir.2003)..........................................................................18

Clouser v. Espy,
    42 F.3d 1522, (9th Cir. 1994), *cert. denied*, 515 U.S. 1141 (1995)......................4

Conant v. U.S.,
    12 Cl.Ct. 689 (1987) .........................................................................................4

Electro-Methods, Inc. v. United States,
    728 F.2d 1471 (Fed. Cir. 1984)...........................................................................9

Hopland Band of Pomo Indians v. United States,
    855 F.2d 1573 (Fed. Cir. 1988)...........................................................................9

Jones v. Flowers,
    547 U.S. ___, 126 S.Ct. 1708 (2006)..................................................................12

Lugar v. Edmondson Oil Co.,
    457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)........................................10

Mennonite Board of Missions v. Adams,
    462 U.S. 791 (1983)...........................................................................................16

Mullane v. Central Hanover Trust Co.,
    339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)............................................9-13

SAIF Corp v. Johnson,
    908 F.2d 1434 (9th Cir. 1990) ............................................................................4

Sartor v. Arkansas Natural Gas Corp.,
    321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944)...............................................3

Schroeder v. City of New York,
       371 U.S. 208 (1962)..................................................................................................16

Sniadach v. Family Finance Corp.,
       395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969)...........................................10

Texaco, Inc. v. Short,
       454 U.S. 516 (1982)............................................................................................10-11

Trentacosta v. Frontier Pac. Aircraft Indus. Inc.,
       813 F.2d 1553 (9th Cir. 1987) .............................................................................2-3

Tulsa Professional Collection Services v. Pope,
       485 U.S. 478 (1988)............................................................................................10-11

United States v. Gen. Motors Corp.,
       323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945)..................................................18

Walker v. City of Hutchinson,
       352 U.S. 112 (1956)................................................................................................12

Weingarten Realty Investors v. Albertson's, Inc.,
       66 F.Supp.2d 825, (S.D.Tex. 1999), *affirmed*, 234 F.3d 28 (5th Cir. 2000) ........................17-18

Yuba Goldfields, Inc. v. United States, 723 F.2d 884 (Fed. Cir. 1983) ...........................................3


**CONSTITUTION/STATUTES/RULES**
Fifth Amendment, U.S. Constitution ..................................................................................passim

28 U.S.C. §1491...................................................................................................................2

28 U.S.C. §2501...................................................................................................................9

RCFC 12(b)(1)......................................................................................................................3

## <u>INTRODUCTION</u>

Plaintiffs own extremely valuable property (referred to herein as the "Wharton Tract") in the state of Tennessee.  On March 24, 1987, the Office of Surface Mining ("OSM"), a division within the Department of the Interior, designated certain property in the Rock Creek Watershed of Hamilton County and Bledsoe County (the "Petition Area") as unsuitable for surface mining. (See Plaintiffs' Response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed on or about June 24, 2004, ("Plain. Resp.") at p. 11, ¶31). Professional Engineer Marcus Wiley has opined that "the designation by OSM of unsuitability within the Rock Creek watershed boundary essentially eliminates the viability of permitting and mining the **<u>entire</u>** Wharton tract."  (Wharton Coal Property Report, attached to Appendix as Exhibit "1" at p. 3)(emphasis added).  As such, it would be futile for Plaintiffs to pursue a mining application from the Office of Surface Mining and Plaintiffs' claims are ripe for adjudication by this court.

For the same reasons enunciated by this court with respect to the government's previous failed motion to dismiss the claims of Benchmark Resources Corporation and Gentry Corporation (referred to herein collectively as "Benchmark"), Sunrise Holding, Inc.'s, fka Santiago, LTD. ("Santiago") cause of action is timely.

Plaintiffs have asserted that the value of property taken by Defendant is $846,385,000.00. (Plain. Resp. at pp.11-12, ¶¶32-33). Whether this figure may eventually be adjusted by the finder of fact because other entities may also have possessed claims as to Plaintiffs' property, is presently inconsequential and does not support the dismissal of Plaintiffs' claims: Plaintiffs unquestionably held a valid property interest in the property taken by the United States at the time of the alleged taking.

As more fully set forth herein, the court should deny the government's motion to dismiss/motion for summary judgment, and enter a new scheduling order so that the issues of whether a taking has occurred and the amount of damages caused thereby may be decided.

## FACTUAL BACKGROUND

Through this action, Plaintiffs are seeking money damages resulting from Defendant's violation of the just compensation clause of the Fifth Amendment to the United States Constitution.  This Court has jurisdiction over this claim pursuant to 28 U.S.C. §1491.  The Court is familiar with the overall facts of this case from its prior rulings and the pleadings filed by the parties.  As such, Plaintiffs will not set out the facts again in a separate section, preferring to address certain facts as necessary in the relevant portions of Argument set forth below.

## STANDARD OF REVIEW

In its Motion, Defendant has presented numerous facts outside of the Complaint. Defendant contends that because it has gone beyond the pleadings, the Court need not accept Plaintiffs' allegations in the Complaint as true.  (United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment, ("Fed. Mtn.") at 20). Plaintiffs do not dispute this proposition.  Defendant overreaches however, when it contends that the Complaint should immediately be dismissed based on the extrinsic evidence it presented, without considering the controverting evidence presented by Plaintiffs.  As explained by the court in Trentacosta v. Frontier Pac. Aircraft Indus. Inc., 813 F.2d 1553 (9th Cir. 1987), *cited in support of Defendant's Motion at page 20*, a motion to dismiss for lack of subject matter jurisdiction is not the proper vehicle to resolve conflicting evidence:

> . . . when ruling on a jurisdictional motion involving factual issues which also go to the merits, the trial court should employ the standard applicable to a motion for summary judgment.  Under this standard, the moving party should prevail only if

the material jurisdictional facts are not in dispute and the moving party is entitled
to prevail as a matter of law.

Trentacosta, 813 F.2d at 1558 (numerous citations omitted).

The Federal Circuit Court of Appeals has cautioned this Court to avoid hastily rendering

summary judgment in takings litigation:

> The fact-intensive nature of just compensation jurisprudence to date, however
> disorienting in other contexts, argues against precipitous grants of summary
> judgment. There may well be just compensation cases in which the United States
> as the moving party is "entitled to judgment as a matter of law, and where it is
> quite clear what the truth is . . . ." Sartor v. Arkansas Natural Gas Corp., 321 U.S.
> 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). There may be such cases. This
> is not one of them.

Yuba Goldfields, Inc. v. United States, 723 F.2d 884, 887 (Fed. Cir. 1983). The Court in Yuba

Goldfields accordingly concluded its opinion as follows:

> The grant of summary judgment where a trial would be fruitless and the moving
> party is clearly entitled to judgment as a matter of law serves an exemplary role in
> the judicial process. Because the remedy can be harsh in its finality, however, its
> application must be accompanied by great care in respect of the entire record and
> the relevant law. The basic fact issue, whether there was or was not a taking,
> having been determined on less than the entirety of a complete record, the grant
> was in this case error. Accordingly, the order dismissing the complaint on the
> government's motion must be vacated and the case remanded for trial.

Id. at 891.

## ARGUMENT

## I. PLAINTIFFS' CLAIMS ARE RIPE

The government asserts that Plaintiffs never filed an application for a permit to mine in

the area at issue. As a result, according to the government, this case is not ripe for adjudication

and must be dismissed pursuant to RCFC 12(b)(1). (Fed. Mtn. at 23-30). It is, however, well

settled that it "serve[s] no purpose to require a claimant to exhaust administrative procedures

before seeking judicial review when it is clear [as in the instant case] that resort to administrative

action would be futile." <u>Conant v. U.S.</u>, 12 Cl.Ct. 689, 693 (1987); *see also, e.g.*, <u>Clouser v. Espy</u>, 42 F.3d 1522, 1532-33 (9th Cir. 1994), *cert. denied*, 515 U.S. 1141, 1533 (1995).

> (there is no requirement of exhaustion where resort to the agency would be futile. <u>SAIF Corp v. Johnson</u>, 908 F.2d 1434, 1441 (9th Cir. 1990). . . Where the agency's position on the question at issue "appears already set," and it is "very likely" what the result of recourse to administrative remedies would be, such recourse would be futile and is not required.)

In the instant case, requiring Plaintiffs to file a permit application would be futile.

As pointed out by the government, "[o]n March 24, 1987, OSM issued a decision designating certain property in Hamilton and Bledsoe Counties as unsuitable for certain coal mining operations." (Fed. Mtn. at 5-6). Further, according to the government, despite the designation, OSM would process applications for proposed surface mining operations outside of the designated area. (Fed. Mtn. at 6). As set forth below, however, with regard to the Plaintiffs in this case, OSM's decision renders the entire Wharton Tract valueless for mining purposes. It would accordingly be futile for Plaintiffs to file a mining permit in this instance.

### A. THE OSM DECISION PREVENTS PLAINTIFFS FROM MINING ANY PORTION OF THEIR PROPERTY; IT WOULD ACCORDINGLY BE FUTILE TO APPLY FOR A MINING PERMIT

Plaintiffs own valuable coal reserves consisting of approximately 149,000,000 tons of coal on real property located in Hamilton and Bledsoe counties in the state of Tennessee.[1] (Exhibit "1" at p. 2). Out of this total tonnage, Plaintiffs could expect to recover 82.4 million tons of coal through mining operations. (Exhibit "1" at p. 2).

On March 24, 1987, the Office of Surface Mining ("OSM"), a division within the Department of the Interior, designated certain property in the Rock Creek Watershed of

---

[1] Plaintiffs' property is sometimes collectively referred to as "the Wharton Tract" because the property was previously owned by the Wharton family. By way of convenience to the Court, Plaintiffs' property is referred to herein as the "Wharton Tract."

Hamilton County and Bledsoe County (the "Petition Area") as unsuitable for surface mining. (Plain. Resp. at p. 11, ¶31)

The Wharton Tract and the Petition Area are not identical properties: the Wharton Tract includes property outside the Petition Area and the Petition Area includes property other than the Wharton Tract. (Fed Ex "J" at App II 419). Nevertheless, the OSM's Decision renders the entire Wharton Tract valueless for mining purposes. As explained by professional mining engineer Marcus Wiley, the mineable reserves on the Wharton Tract may be further classified as follows: (1)Sewanee coal seam; (2)Hall, Middle, and Rock Creek drainages; and (3)underground coal. Unfortunately for Plaintiffs, the OSM's decision actually and/or effectively precludes Plaintiffs from recovering any of this property. Mr. Wiley reports that the OSM decision categorically prohibits Plaintiffs from even attempting to mine more than 58% of their property, and effectively precludes Plaintiffs from mining 100% of the property:

> [T]he designation of certain lands in the Rock Creek watershed, Tennessee as unsuitable for surface coal mining operations by the Office of Surface Mining has removed from the Wharton tract, a total of 47.9 million tons of coal from the viability of mining.

(Exhibit "1" at p. 3).

Unfortunately, the 47.9 million tons of Plaintiffs' coal that falls squarely within the Petition Area and is precluded by the OSM decision, constitutes the center of Plaintiffs' coal reserves. The remaining less than 42% of Plaintiffs' coal located outside of the Petition Area is dispersed throughout the Wharton Tract in such a way that Plaintiffs are unable to recover any of the coal located in the Sewannee coal seam, Hall, Middle, or Rock Creek drainages, or even the underground coal reserves.

> Although the OSM designation decision states that the Sewanee coal seam, could be mined using some unconventional overburden mixing technique for reclamation, it is my opinion that a method acceptable to the regulatory authority

> within the watershed boundary is not economically available. For most areas, multiple seams need to be mined together to provide acceptable economic limits. The Hall, Middle, and Rock Creek drainages are designated [by OSM] as unsuitable for all surface mining operations, and these drainages contain most of the surface mineable coal on the Wharton tract. It is my opinion, due to the potential surface impact from underground mining, such as possible subsidence and probable hydrologic consequences, that the underground mining of coal from areas contained within the Rock Creek watershed boundary are also precluded from mining due to the OSM designation of unsuitability within the drainage areas.

(Exhibit "1" at p. 3).

As such, Mr. Wiley concludes that the OSM Decision has rendered the Wharton Tract

valueless for mining purposes:

> It is my opinion that of the 82.4 million tons that are potentially recoverable from the Wharton tract, that by the removal of 47.9 million tons in the center of the reserve, although the remaining 34.5 million tons may be technically mineable, the overall impact to the property is that not enough coal is left contiguously mineable to amortize the capital cost for infrastructure (office, shop, warehouse, coal preparation plant, portal, ventilation, rail access, load out, employee training, continuous miners, belt haulage, surface mining equipment, sediment control, etc.) to justify mining any tonnage at all. **It is therefore, my opinion that the designation by OSM of unsuitability within the Rock Creek watershed boundary essentially eliminates the viability of permitting and mining the entire Wharton tract.**

(Exhibit "1" at p. 3)(emphasis added).

Mr. Proctor's deposition testimony, rendered two months prior to Mr. Wiley's report,

confirms the foregoing:

> Q. Darold, why did you purchase the property?
> A. The main reason was to mine the coal.
>
> Q. Why did you think you could mine the coal?
> A. We had two reports at that point in time that I'd read prior to buying the tract, and then we engaged Art Thompson to do a report for us, including mining sites, and basically we had no problems with water in any of the reports and we had no problem with any surface problems in the reports, so I felt like it was ready to go to work.

Q.  Why didn't you apply for a mining permit then, or why haven't you applied for a mining permit?

A.  Well, I haven't applied because of the unsuitability petition that's filed on the tract, the petition area and the designated portion of the Rock Creek watershed where our main reserves are.

Q.  Let me make sure I understand this.  You testified yesterday that you have some property that is not affected by the designated area, right?

A.  That's right.

Q.  Why haven't you applied for a mining permit for that property outside of the designated area?

A.  It's just not feasible to mine outside the designated area or the petition area because they're just a small, they're on the very fringe of the tract and it just wouldn't possibly be attractive as far as economics.

Q.  Why haven't you applied for a mining permit to that property within the designated area?

A.  Because it would be denied by OSM.

(Deposition of Darold Proctor attached as Exhibit "2," at 277-78).

As the OSM Decision prevents Plaintiffs from mining any portion of the Wharton Tract, it would be futile to apply for a mining permit.  This case is ripe for adjudication.

**B.    PLAINTIFFS PURSUED ADMINISTRATIVE REQUIREMENTS IN GOOD FAITH; DEFENDANT DID NOT ADVISE HOW ADMINISTRATIVE REMEDIES WERE TO BE EXHAUSTED**

While the doctrine of futility relieves Plaintiffs from seeking a mining permit in this instance, it is noteworthy that Plaintiffs nonetheless specifically sought to comply with all administrative requirements once they were apprised of the OSM decision.

Plaintiffs did not learn of the OSM Decision until it was sent to them on March 30, 2000. (Plain. Resp. at pp. 13-14; Deposition of Howard Cohen attached as Exhibit "3" at 98-100, 144-148).  On November 24, 2001, Plaintiffs wrote to the Director of Office of Surface Mining to inquire as to any "variances, waivers, and/or administrative remedies that must be sought or exhausted before [the OSM Decision] is judicially reviewed."  (Affidavit of Darold Proctor, with

attached correspondence, attached as Exhibit "4"). Plaintiffs specifically requested whether the owners would first be required to file permit applications and also noted that:

> It is our desire to exhaust all administrative remedies, and are seeking any and all agency (OSMRE) determinations regarding all the aforementioned questions, and any other administrative relief required, under all the federal statutes addressed in the final statement. If any of the abovementioned administrative relief questions are not responded to, [we] will determine that no administrative relief is required . . . .

Plaintiffs did not receive any response to this letter. (Id.) On January 4, 2002, Plaintiffs again requested, by facsimile transmission, that OSM provide them with "the specific procedures required to exhaust all . . . administrative remedies" under SMCRA. Plaintiffs noted in such letter that "[u]nless we hear from you to the contrary by February 9, 2002, we will assume that you are denying the requested administrative relief and that we have thereby exhausted our administrative remedies as the necessary prerequisite to seeking Judicial review." (Id.) Plaintiffs also sent this letter regular and certified mail to the Director of OSM. (Id.)

When Plaintiffs still did not receive any response to this second letter, Plaintiffs wrote a third time to OSM on January 20, 2002 for this information. (Id.) Plaintiffs were never advised by OSM what specifically was required in OSM's view to exhaust all administrative remedies. Plaintiffs accordingly filed the instant lawsuit. (Id.)

## II.    SANTIAGO'S CLAIMS ARE TIMELY

Next, the government resurrects its failed statute of limitations argument previously employed against Benchmark, and asks the court to dismiss the complaint as against Santiago. (Fed. Mtn. at 30-36). It is readily apparent that Defendant's motion is more an invitation for the Court to reverse its prior legal rulings, than an argument that Santiago is sufficiently different from Benchmark such that the Court's prior holding requires dismissal of Santiago's claim.

Because the Court correctly construed the law in the first instance, the United States' motion to dismiss Santiago's claim pursuant to the applicable statute of limitations must also be denied.

### A.    CLAIM ACCRUAL

Pursuant to 28 U.S.C. §2501, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."  A claim first accrues "when all the events which fix the government's alleged liability have occurred **and** the plaintiff was or should have been aware of their existence."  Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988)(emphasis added).

Defendant continues to argue that Plaintiffs' claims sound in due process or are mere challenges to various administrative procedures and that this Court does not have jurisdiction to hear such claims.  This mischaracterizes Plaintiffs' claims.  Plaintiffs' claims result solely from Defendant's violation of the Fifth Amendment to the United States Constitution and the Federal Claims Court has exclusive jurisdiction over such claims.  Inasmuch as claim accrual depends on when the plaintiff "was or should have been aware" of the existence of the claim, the Court must consider due process requirements, consistent with Mullane v. Central Hanover Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).[2]

---

[2] Defendant cannot seriously contend that, unlike every other tribunal in the United States of America, the Constitution remains firmly shut to this Court alone.  Clearly, the Court of Federal Claims may properly consider due process issues, provided that the Court has jurisdiction over the underlying claim.  See e.g., Electro-Methods, Inc. v. United States, 728 F.2d 1471, 1475-76 (Fed. Cir. 1984)(noting "with approval the trial court's exposition of the concept of due process") and A.T.L., Inc. v. United States, 736 F.2d 677 (Fed. Cir. 1984).

**B.     MULLANE REMAINS THE CORRECT STANDARD FOR PURPOSES OF DETERMINING WHETHER NOTICE IS CONSTITUTIONAL AND PROPER**

In ruling on Defendant's motion with respect to Benchmark, the Court (correctly) relied on Mullane on its progeny.  Defendant now contends, however, that the due process concepts expressed in Mullane have no application to statutes of limitation, including the Tucker Act statute of limitations.  Defendant's argument that "self-executing" statute of limitations, which do not require any government involvement such that 5th Amendment concepts of due process are inapposite, is based exclusively on Tulsa Professional Collection Services v. Pope, 485 U.S. 478 (1988), which in turn depends on Texaco, Inc. v. Short, 454 U.S. 516 (1982).  As explained in Tulsa Professional, it is the *de minimis* character of government action in true self-executing statute of limitations situations which circumvents due process requirements:

> The State's interest in a self-executing statute of limitations is in providing repose for potential defendants and in avoiding stale claims. The State has no role to play beyond enactment of the limitations period. While this enactment obviously is state action, the State's limited involvement in the running of the time period generally falls short of constituting the type of state action required to implicate the protections of the Due Process Clause.

Id. at 486-87.  The Court also noted, however, that "when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." Id. at 486 (citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969)).

In other words, based solely on statute of limitations, the government could technically deprive an individual of property, yet not implicate due process considerations, when the government takes no additional action besides enacting the statute of limitations itself.  For example, suppose the government adopts a two year statute of limitations for personal injury actions.  Suppose further that Mr. Smith thereafter runs over Mr. Jones, causing injuries to Mr.

Jones.  If Mr. Jones does not file his complaint within 2 years of the date of the injury, his claim will be forever barred and he will have lost the right to recover compensation against Mr. Smith. Tulsa Professional stands for the proposition that Mr. Jones is **not** able to assert a "due process" argument against the government for failing to notifying him of the statute of limitations: the statute is self-executing, without any additional governmental action.  Conversely, where the government either creates the claim, or is significantly involved in the claim process, consistent with the very cases cited by government, due process considerations are necessary.

Tulsa Professional involved a creditor's attempt to compel an estate to pay the expenses of the decedent's last illness.  Under the applicable Oklahoma statute, the personal representative of the decedent's estate was able to merely publish notice to decedent's creditors.  The creditors were then required to present their claims, if at all, within two months following the publication of the notice.  Although the State's involvement was far less than Defendant's actions in the case at bar, the Court noted that the probate court was intimately involved throughout the process; indeed, without the state's involvement, the "time bar is never activated."  Id. at 487.  As such, the Court ruled that "where the legal proceedings themselves trigger the time bar, even if those proceedings do not necessarily resolve the claim on its merits, the time bar lacks the self-executing feature that Short indicated was necessary to resolve any due problem.  Rather, in such circumstances, due process is directly implicated and actual notice generally is required."  Id.

In the present case, Defendant is no mere spectator on the field of takings litigation, merely awaiting the passage of time.  Instead, by (1)processing the initial petition; (2)providing notice to persons who may be affected by the petition; (3)conducting an environmental impact study; (4)holding public meetings; (5)reaching a decision; (6)providing notice of the decision;

etc., it is the Defendant who actually creates the claim. As such, due process considerations are necessary and constitutionally guaranteed.

For half a century now, the Court has observed that the "notice required will vary with circumstances and conditions." Walker v. City of Hutchinson, 352 U.S. 112, 114 (1956). As late as 4 months ago, the United States Supreme Court reaffirmed the overarching principles elicited in Mullane to test the adequacy of notice:

> '[w]hen notice is a person's due, . . . . [t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it,' and that assessing the adequacy of a particular form of notice requires balancing 'the interest of the State' against 'the individual interest sought to be protected by the Fourteenth Amendment.'

Jones v. Flowers, 547 U.S. __ , 126 S.Ct. 1708 (2006)(noting that when a mailed notice of tax sale is returned unclaimed, a State must take additional steps to notify the property owner before selling his property).

In denying the government's motion to dismiss with respect to Benchmark, the Court previously found that (1)Plaintiffs own the majority of the property within the area designated by OSM as unsuitable for mining; (2)Plaintiffs' claimed loss is in excess of $800 million; (3)Defendant is unsure as to the mailing lists used to transmit notice of the Decision; (4)notice of the Petition may have been sent to Joe Bagwell but that Mr. Bagwell was not Plaintiff Benchmark's agent; (5)Defendant merely consulted property tax records in gathering the list of property owners; and (6)the statute of limitations has not run as against Benchmark. The question then becomes, are the facts surrounding notice to Santiago, who, along with Benchmark, owned a 50% undivided interest in the property, sufficiently different such that the statute of limitations has run against Santiago's claims?

### C.    SANTIAGO DID NOT RECEIVE ADEQUATE NOTICE

The United States argues that three factors justify the immediate dismissal of Santiago's claims and, unlike Benchmark, prevent it from pursuing the opportunity of collecting in excess of $400 million through this action.  These factors, which are addressed in turn, do not individually or collectively justify this disparate treatment.

Defendant first argues that Santiago's deed does not provide an address other than Mr. Bagwell's.  This is incorrect.  The quitclaim deed provides an address for Santiago's long time attorneys, Warshaw Burstein Cohen Schlessingner and Kuh in New York.  (Fed Ex O at App II 459, 470).  Clearly, if one actually desired to provide notice to Santiago of the OSM Decision, as is required by Mullane, one would consult with Santiago's attorneys.   Santiago's attorney Howard Cohen provided extended testimony on this point:

> Q.    Do you see any indication there [on the Deed] that your firm is—apart from being the firm that prepared the document, do you see any indication that your firm is actively representing Mr. Peloquin as trustee?
> A.    Well, first of all, my concern was primarily with the assignment to Santiago or the quitclaim deed to Santiago because that was the effective document in terms of—of the situation when you send out the notice of designation.  But even on this document I would say if I were the government and I wanted to give notice of something and I didn't have a direct address, the first person I would contact is Warshaw Burstein.  They obviously represented the client.  We prepared the document.  They would be the natural entity to go to get information so Santiago could be contacted.  I think these documents support it.
> * * * *
> Q.    This identifies Warshaw Burstein only as the tax representative, does it not?
> A.    No.  At the top it says this instrument was prepared by Warshaw Burstein.
>
> Q.    But it also indicates that mail is to be forwarded to Mr. Bagwell, doesn't it?
> A.    I don't know who wrote that in, why or when.  I had nothing to do with that.  All I know is we did prepare the document.  And even down below it says tax notices are to go to Warshaw Burstein.  So I don't know what the meaning of that Bagwell thing is up there.

Q.    In point of fact, it sounds like the tax notices did initially go to your firm, did they not?

A.    As far as I recollect, yes.

Q.    And at some point they were amended to be directed to Mr. Bagwell?

A.    Maybe that's -- maybe that's when he marked this. I don't know when he did it. I have no idea. But we purposely --there was a reason for putting in that we drafted it, that it was prepared by Warshaw Burstein. We weren't trying to advertise.

Q.    To your knowledge, in 1984 would anyone have knowledge of your firm's interest in these transactions unless they looked at title records?

A.    Well, I don't -- I don't know what you mean by anyone. A lot of people knew we were involved. Are you talking about the government particularly?

Q.    That's a good question. If somebody were searching public records, would somebody be able to ascertain Warshaw Burstein's involvement in these transactions without researching title?

A.    Well, I know what I would do if I were doing it. The first thing I would [look] to is the title recording because that's the effective instrument. That's where I would look before anywhere else. That's the reason we put our name on there. I assume that's how you found Bagwell's name. Somebody must have looked at this and seen Bagwell's name.

Q.    Have you independently ascertained what the tax authorities in Bledsoe and Hamilton County indicated?

A.    No. I'll tell you why. I don't think it's relevant. Who received notices for tax purposes has nothing to do with who should receive notices of the designation of the petition. It's purely a tax thing.

    The first thing I would like to see if there is any other address there that should be somebody that I contact. And I've done this before. The first thing I'd say is my God, Warshaw Burstein prepared this, let me contact them, they must know who Santiago and where they're located.

    I mean, I assume this mail to Bagwell has to do with what we did with Bagwell eventually. He was going to get the tax notices, but that had nothing to do with anything else.

(Exhibit "3" at 154-58).

    Defendant next argues that, unlike Benchmark or Gentry, the mailing lists identify Santiago and notice was sent care of Joe Bagwell. This argument fails for three reasons. First, as noted by the Court in denying Defendant's initial motion to dismiss, the government does not have a record of the mailing lists actually employed to transmit the Decision. Owing to the

myriad of errors that occurred in this, the first Petition considered by OSM after taking this function over from the State of Tennessee, (e.g., no notice was sent to Benchmark even after Benchmark corresponded with OSM, the mailing lists were not revised to include Benchmark's new address, Benchmark's letters were filed in the "intervenor" portion of the administrative file, no records were kept of the mailing list used to transmit the decision, etc.), it is unrealistic and overly charitable to Defendant to conclude that the <u>Decision</u> was ultimately sent to Joe Bagwell.

Second, even if the Decision was sent to Joe Bagwell, this is inconsequential as Mr. Bagwell was not Santiago's agent, any more than he was Benchmark's agent.  (Plain. Resp. at p. 9, ¶17).  As with Benchmark, other than certain specific issues on which Santiago occasionally consulted Mr. Bagwell, Mr. Bagwell was only asked to pay the property taxes and collect the Hiwassee timber lease rents. (Exhibit "3" at 121-24)("the only thing [Santiago] asked him to do is pay the taxes and collect the Hiwassee rents."  Exhibit "3" at 122:3-5).

Third, the mailing lists actually reference "Santia<u>c</u>o" as opposed to "Santia<u>g</u>o."  The taking of millions of dollars of property falls outside of that category of events (i.e., horseshoes, hand grenades) where "close enough" is adequate.

As a final argument, Defendant observes that unlike Benchmark, Santiago did not write to OSM to provide it with an alternate address.[3]  Indeed, no one on Santiago's behalf wrote to OSM because Santiago was completely unaware of the Petition and Decision until after being apprised by Mr. Proctor of same in March 2000.  (Exhibit "3" at 98-100, 144-48)("Q. Just so we are clear, is it your testimony that you never received notice of any single milestone related to the filing of the petition? A. Prior to 2001, that's correct." Exhibit "3" at 100:21-25).

---

[3] Despite its obvious failures in processing correspondence from Benchmark, Defendant contends that it would have somehow "gotten it right" and amended its mailing lists to include Santiago if Santiago had written to OSM.

Had Defendant simply consulted the records of the Hamilton County's and/or Bledsoe County's Recorder's Offices, it would have learned that Santiago and Benchmark were the largest property owners in the Petition Area.  Instead it contented itself with publishing the Decision and by opting to take the easy course, it deprived Benchmark and Santiago of over $400 million each.

As set forth above, Santiago did not receive actual notice of the Decision. Given the minimal effort required of Defendant, and the resulting astronomical harm to Santiago, the Court should rule, as it correctly did as to Benchmark, that publication did not result in constructive notice to Santiago in this instance.  In so doing, the court is requested to follow long established precedent from the United States Supreme Court: "notice by publication is not enough with respect to a person [or entity] whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question." Schroeder v. City of New York, 371 U.S. 208, 212-13 (1962); *accord*, Mennonite Board of Missions v. Adams, 462 U.S. 791, 800 (1983)(holding that "actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party, whether unlettered or well versed in commercial practice, its name and address are reasonably ascertainable.").

## III.    PLAINTIFFS HAVE A COMPENSABLE PROPERTY INTEREST IN THE WHARTON TRACT

Lastly, Defendant contends that because Plaintiffs had leased the property to others, Plaintiffs had absolutely no property interest in the Wharton Tract such that no takings could possibly have occurred.  This argument is untenable.  It is undisputed that after leasing the property in this instance, Plaintiffs retained ownership of the property and possessed, at a minimum, an enforceable reversionary interest and/or a claim for royalties from the mining

efforts of others.[4]  If the government's argument is carried to its logical conclusion, it would mean that it could act with impunity towards lessors.  Thus, according to the government, assuming that (1)Plaintiffs leased the property to others for 5 years and (2)in year 3 of the lease, the government physically appropriated Plaintiffs' property by building a road through it, for example, Plaintiffs' property would not be "taken" because the Plaintiffs possessed no property interest.

The law does not support this argument.  Rather, "owners" of property, whether the owners are lessors or lessees, have a compensable property interest for purposes of takings litigation.  Weingarten Realty Investors v. Albertson's, Inc., 66 F.Supp.2d 825, 845 (S.D.Tex. 1999), *affirmed*, 234 F.3d 28 (5th Cir. 2000)(citations omitted).

As such, there is no basis for limiting the compensable property interest to the leasehold interest, while ignoring the owner's reversionary interest.  Instead, "in the event of a taking, both the lessor and lessee for years are entitled to share in the award according to their respective

---

[4] The Timber Lease provides in pertinent part that, even during the time period of the Lease, "Lessor reserves and retains all coal, oil, gas and other minerals and mineral rights in, on, or beneath the above described lands not heretofore granted to or reserved by third persons, but shall not develop, mine, extract, or remove the same without the prior written consent of Lessee **which shall not be unreasonably withheld** . . . ."  (U.S. Ex. T, App II at 558)(emphasis added).

The Coal Lease was for the presumptive period of 20 years, however, this time period could have been shortened or lengthened.  (U.S. Ex. U, App II at 570).  During the period of the Coal Lease, the lessees were required to pay Plaintiffs minimum royalty payments of $7,680,000.00 annually.  (U.S. Ex. T, App II at 572).  Plaintiffs also envisioned ultimately mining the property themselves.  (Exhibit "2" at 277-78; Exhibit "3" at 39-40).  Unfortunately, Plaintiffs received no payments from the lessees of the Coal Lease: it did receive some compensation from a settlement with Tennessee Partners.  (Exhibit "3" at 54-56).

interests. Specifically, compensation is due the lessor for damages to its reversionary interest and to the lessee for damages to its leasehold." Id. at 845-46 (citations omitted).[5]

Similarly, it is not necessary for the landowner to have actual possession of the property in order to have a compensable property interest. As the Federal Circuit Court of Appeals has succinctly stated, for purposes of determining whether property has been taken,

> Present possessory rights are, thus, not necessary. It is also clear that fee owners who transfer a leasehold interest are still entitled to compensation Alamo Land & Cattle Co. v. Arizona, 424 U.S. 295, 303, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976) (explaining that a lessor is entitled to compensation for the taking of leased land regardless of whether the lessor has possession of the land at the time it is taken- the measure of damages simply does not include the value of the leasehold interest if the lessor does not have possession). In fact, "[e]very sort of [real property] interest the citizen may possess" counts as a property interest under the Fifth Amendment. United States v. Gen. Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945).

Cienega Gardens v. U.S., 331 F.3d 1319, 1329 (Fed. Cir.2003).

Moreover, the Coal Lease with Tennessee Partners assured that Plaintiffs would receive certain royalty payments. By virtue of the OSM Decision precluding mining of the Wharton Tract, neither Plaintiffs nor their lessees were able to perform any mining. As such, Plaintiffs did not and could not have received any royalty payments. "In Tennessee, a non-participating royalty interest is 'classified as realty.' Therefore, a non-participating royalty interest in

---

[5] Of course, the amount of compensation to which a lessor/owner is entitled may be impacted by the presence of a lease on the property. Id. at 846. Thus, at some point, the trier of fact may have to consider whether Plaintiffs' damages are diminished by the leases on the Wharton Tract. Given, for example, that (1)the terms of the Timber Lease did not allow Hiwassee/Bowater to unreasonably withhold consent to Plaintiffs' mining operations (U.S. Ex. "T" at 558) and (2)Tennessee Partners, as lessees, had filed a lawsuit seeking rescission of the Coal Lease prior to the issuance of the Decision (Exhibit "4" hereto), Plaintiffs will contend that its damages are not significantly impacted by the leases, if impacted at all. The Court need not resolve these issues at present. As more fully set forth herein, even if Plaintiffs possessed no more than a claim for royalties under the Coal Lease, Plaintiffs nevertheless possess a valid compensable property interest in this instance.

Tennessee is a real property interest compensable under the Fifth Amendment."   Cane Tennessee, Inc. v. United States, 60 Fed. Cl. 694, 699 (2004).

In their First Amended Complaint, Plaintiffs assert that the value of property taken by Defendant is $846,385,000.00.  The issue of damages may be affected by such matters as the Timber Lease, the Coal Lease, or the litigation with Tennessee Partners.  Whether this figure may eventually be adjusted by the finder of fact because other entities may also have possessed claims as to Plaintiffs' property, however, is for the moment inconsequential, and does not support the dismissal of Plaintiffs' claims at present.  The Plaintiffs undoubtedly hold a compensable property interest in the Wharton Tract.  The questions of whether a taking has occurred and if so, the amount of compensation to which Plaintiffs are entitled will be decided at a later date.

## CONCLUSION

As the Decision deprives Plaintiffs of the ability to mine any portion of their Property, it would be futile for Plaintiffs to pursue additional administrative remedies.  Further, Plaintiffs' requests as to what additional administrative remedies were required by OSM fell on deaf ears.  Plaintiffs' claims are ripe for adjudication.

The Court should not revisit the legal conclusions it established for claims accrual purposes.  The facts surrounding notice to Santiago do not differ sufficiently from those facts involving notice to Benchmark to justify reaching a completely inapposite result for the statute of limitations as to Santiago.

Finally, even if Plaintiffs had no more than a right to receive royalty payments, or if Plaintiffs are viewed as mere lessors of the property, Plaintiffs nevertheless possess a valid, compensable property interest.

The court should deny the government's motion to dismiss/motion for summary judgment, and enter a new scheduling order so that the issues of whether a taking has occurred and the amount of damages caused thereby may be decided.

RESPECTFULLY SUBMITTED this 29th day of August, 2006.

**BENCHMARK RESOURCES CORPORATION,**
**GENTRY CORPORATION & SUNRISE HOLDING, INC.**


By:     s/ James N. MacKinlay
        James N. MacKinlay
        1019 South Stapley
        Mesa, Arizona  85204
        Phone: (480) 898-9239
        Fax: (480) 833-2175
        Attorney of Record for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned certifies that on this 29th day of August, 2006, a true and correct copy of Plaintiffs' Response to Defendant's Motion to Dismiss For Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment, was served via first class mail, postage prepaid, on Defendant's counsel of record:

              James D. Gette
              U.S. Department of Justice
              Environment & Natural Resources Division
              P.O. Box 663
              Washington, D.C. 20044

                    <u>s/ James N. MacKinlay</u>
                      James N. MacKinlay