IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BENCHMARK RESOURCES ) <br> CORPORATION, GENTRY ) <br> CORPORATION and SUNRISE ) <br> HOLDING, INC., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES OF AMERICA, ) <br> ) <br> Defendant. ) | No. 03-178L <br><br> Honorable Christine Odell Cook Miller |

**REPLY BRIEF IN SUPPORT OF UNITED STATES' MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

There is a small set of simple and undisputed facts that require the dismissal of this lawsuit. First, there is no dispute that Plaintiffs have never filed an application for a permit to mine the property at issue in this case. Because Plaintiffs have failed to seek the statutorily required permit, Plaintiffs' taking claim is not ripe and must be dismissed by the Court. Second, Plaintiff Santiago filed this lawsuit more than 15 years after the events that fixed the government's alleged liability. As a result, Santiago's claim is time-barred by the Tucker Act's six year statute of limitations. 28 U.S.C. § 2501. Finally, at the time of the alleged taking in 1987, a timber lease precluded Plaintiffs from conducting surface coal mining on a portion of their property. Plaintiffs had also granted the right to coal mine the entire property to a third party. As such, Plaintiffs had no right to mine the Wharton Property in 1987 and, therefore, had no compensable property interest at the time of the alleged taking.

**I.      PLAINTIFFS' CLAIM IS NOT RIPE**

Plaintiffs do not deny that, under the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), they must submit an application for a permit and be granted a permit before they can legally mine their property.  30 U.S.C. § 1256(a).  Also, Plaintiffs admit that they have never filed an application for a permit to mine their property.  02/14/2006 Proctor Dep. 185:16-18 (U.S. Ex. K, App. III 429).  As such, Plaintiffs have no basis to allege that their claim is ripe.  Instead, Plaintiffs argue that they are entitled to invoke a futility exception to the ripeness requirement.  Plaintiffs, however, attempt to stretch the futility exception well beyond the limits the Federal Circuit has placed on that exception.

**A.      <u>Plaintiffs Misapply the Futility Exception to the Ripeness Requirement</u>**

Where a previous permit application has been denied and that denial makes clear that the agency will not grant a permit for any use, the futility exception is intended to protect a party from having to return to the same federal agency multiple times.  As the Federal Circuit announced in <u>Howard Heck & Assocs. Inc. v. United States</u>, "the futility exception simply serves to 'protect property owners from being required to submit *multiple* applications when the manner in which the first application was *rejected* makes it clear that no project will be approved.'"  134 F.3d 1468, 1472 (Fed. Cir. 1998) (emphasis in original) (citing <u>Southern Pac. Transp. Co. v. City of Los Angeles</u>, 922 F.2d 498, 504 (9th Cir. 1990)).

In the instant case, Plaintiffs do not meet the limited futility exception endorsed by the Federal Circuit.  First, Plaintiffs have <u>never</u> submitted a single application for a permit to mine their property.  Second Declaration of Douglas K. Siddell ("Siddell Dec. II") at ¶ 16 (U.S. Ex. V, App. III at 592).  Second, because Plaintiffs have never submitted a permit application, the Office of Surface Mining ("OSM") has never rejected any such application.  Third, a portion of

Plaintiffs' property is not within the Petition Area and has never been designated as unsuitable for surface coal mining operations.[1]  Fourth, as set forth in detail below, OSM has the authority to permit a wide range of mining operations on the Wharton Property both outside and within the Petition Area.  See generally Siddell Dec. II at ¶¶ 6-7 (U.S. Ex. V, App. III at 589-590).

      The Court of Federal Claims has previously dismissed a takings claim as unripe in a case that is virtually identical to the case at bar.  In Cane Tenn. Inc. v. United States, like in the instant case, a portion of the property owned by plaintiff Colten had been designated unsuitable for surface mining pursuant to SMCRA.  57 Fed. Cl. 115 (2003).  As a result, Colten brought a takings claim arguing that the designation effectively prevented mining on the entire property at issue.  Id. at 129.  In ruling that Colten's claim was not ripe, Judge Hewitt stated that "[p]laintiff cannot argue that it would be futile to apply for a permit to mine the undesignated area."  Id. at 130.  Similarly, a substantial portion of the property at issue in this case falls outside of the designated area.  As such, the futility exception cannot apply.[2]  Moreover, Judge Hewitt further held that the futility exception to the ripeness requirement is only available to plaintiffs who have made at least one meaningful permit application to the regulatory agency.  Id. ("futility exception generally requires that a permit be denied before [the exception] applies"); see also Eastern Minerals Int'l v. United States, 36 Fed. Cl. 541, 548 ("[e]ach plaintiff must satisfy the threshold requirement of a single meaningful application to maintain the futility exception").

---

[1] See Plaintiffs' Response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment ("Pls. Resp.") at 5 ("The Wharton Tract and the Petition Area are not identical properties: the Wharton Tract includes property outside the Petition Area. . .").

[2] Indeed, far from being futile, the evidence indicates that there is good reason to believe that mining on the Wharton Property may be permitted.  Since it took over the permitting of mining in Tennessee in 1984, OSM has granted more than 80 % of the new permit applications accepted for processing and on which it rendered a decision.  Siddell Dec. II at ¶ 13 (U.S. Ex. V, App. III at 591).

Instead of relying upon the accepted breadth of the futility exception, Plaintiffs attempt to craft an "economic futility" argument. In Morris v. United States, the plaintiffs raised a similar argument in an attempt to stretch the futility exception past its intended limits. 392 F.3d 1372 (Fed. Cir. 2004). In that case, the Federal Circuit considered a takings claim by property owners who argued that the application for a permit was futile because the application process would be cost prohibitive. Id. at 1375-76. The Federal Circuit rejected the plaintiffs' argument in Morris. The Federal Circuit reasoned that "[w]here further administrative process could reasonably result in a more definite statement of the impact of the regulation, the property owner is generally required to pursue that avenue of relief before bringing a takings claim." Id. at 1376.

The futility exception as applied by the Federal Circuit is far from the facts of the instant case. Plaintiffs have never submitted a single application for a permit to mine their property. OSM has never rejected an application to mine Plaintiffs' property. Indeed, even Plaintiffs admit that mining can be permitted on at least a portion of their property which lies outside of the Petition Area. Given these undisputed facts, Plaintiffs' claim is not ripe and the case should be dismissed.

  **B.**  **Plaintiffs Have Failed to Present Competent Evidence of Futility**

Even if the economic futility exception proffered by Plaintiffs was not precluded as a legal matter, Plaintiffs have failed to meet their burden to prove facts that support their invocation of this Court's jurisdiction. The ripeness argument raised by the United States represents a challenge to this Court's jurisdiction. As such, Plaintiffs "must support [their jurisdictional allegations] by competent proof." Catellus Dev. Corp. v. United States, 31 Fed. Cl. 399, 404-05 (1994) (quoting McNutt v. General Motors Acceptance Corp., 198 U.S. 178, 189 (1936)). Plaintiffs have not provided competent proof of economic futility.

4

### 1. Plaintiffs' Alleged "Expert Report" Is Unsworn

Plaintiffs present a theory of "economic futility" based upon a report submitted by Marcus Wiley ("Wiley Report"), who they claim is a "professional mining engineer." Pls. Resp. at 5.[3/] The Wiley Report, however, is unsworn and not supported by an affidavit or declaration made "under penalty of perjury." RCFC 56(c) clearly states that a motion may be supported by "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any. . . ." In addition, pursuant to 28 U.S.C. § 1746, an affidavit or declaration must be "subscribed . . . as true under penalty of perjury." The Wiley Report does not fall into any of the accepted supporting materials permitted by Rule 56 and was not made "under penalty of perjury." As such, the Wiley Report may not be considered by the Court in deciding the instant motion.

### 2. Plaintiffs Present No Evidence that Mr. Wiley is a Competent Witness

RCFC 56(e) also requires that any affidavit "show affirmatively that the affiant is competent to testify to the matters stated therein." Plaintiffs have provided no evidence to support their allegation that Mr. Wiley is an expert qualified to offer the opinions contained in his report. Unlike Alan Stagg[4/] whose declaration is offered by the United States in support of this reply brief, Mr. Wiley provides no evidence of his education, training, or experience. Because Plaintiffs have not demonstrated that Mr. Wiley is "competent to testify to the matters"

---

[3/] Plaintiffs also cite to the self-serving lay testimony of Darold Proctor, the President of two of the Plaintiff companies. Pls. Resp. at 6-7. Mr. Proctor, however, admits that he has absolutely no "education or background" in the coal industry. 02/13/06 Proctor Depo. 65:23-66:5 (U.S. Ex. W, App. III at 601-602). As such, his testimony regarding potential coal reserves is not competent and may not be considered by the Court.

[4/] In his declaration, Mr. Stagg sets forth his qualifications, education, and experience under penalty of perjury and attaches his detailed resume. See Declaration of Alan K. Stagg ("Stagg Dec.") ¶ 1 (U.S. Ex. X, App. III at 603, 616-628).

in his report, the Wiley Report and Mr. Wiley's conclusions may not be considered by the Court.

### 3. The Wiley Report Is Not Admissible Evidence

The Wiley Report contains nothing more than conclusory opinions unsupported by data or meaningful analysis. The report, which would be inadmissible at trial, also cannot be relied upon by the Court in determining whether it has jurisdiction to hear the instant complaint. RCFC 56(e) requires that information submitted by affidavit in support of or in opposition to a dispositive motion " . . . be admissible as evidence." Before expert opinion testimony is admissible, the Court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579, 592-93 (1993).

As set forth in detail in the attached declaration by Alan Stagg – a registered professional geologist with 42 years of experience in the mining industry and who is familiar with the geology of the Wharton Property at issue here – the Wiley Report (1) does not meet the generally accepted standards for estimating coal reserves and (2) does not provide evidence that would allow the Court to assess the level of reliability of his conclusions. Both of these omissions represent critical failures for admissibility of expert opinion evidence under Daubert. In addition, Mr. Wiley has not applied his conclusions to the property at issue in this case.

First, Mr. Wiley fails to apply generally accepted techniques for estimating coal reserves. As Alan Stagg's declaration indicates, geologists in the coal industry generally rely upon the *Coal Reserve Classification System of the U.S. Geological Survey* ("Circular 891") and *The SME Guide for Reporting Exploration Results, Mineral Resources, and Mineral Reserves* ("2005 SME Guide") to estimate economically viable coal reserves. Stagg Dec. ¶¶ 9-13, Ex. 2, & Ex. 3

(U.S. Exs. X, X-2, & X-3, App. III at 605-07, 629-702 & 703-746). Mr. Wiley never once mentions either of these accepted standards in his report and there is no indication that he relied upon or applied the standards contained in Circular 891 or the 2005 SME Guide. Id. ¶ 8.

Second, Mr. Wiley has failed to define the key terms contained within the ultimate conclusions he offers to the Court. For example, Mr. Wiley fails to define the terms "Reserve" and "Recoverable Reserves" as used in his report. Stagg Dec. ¶¶ 16-18 (U.S. Ex. X, App. III at 608-09). Moreover, Mr. Wiley has failed to define the time period applicable to his conclusions. Because the economic viability of coal mining is driven in large measure by coal selling prices and given that coal selling prices can vary substantially over time, the failure to define the relevant time period applied in the report renders Mr. Wiley's conclusions essentially meaningless. Id. ¶ 17 (U.S. Ex. X, App. III at 608).

Third, The generally accepted standards for estimating coal reserves – Circular 891 and the 2005 SME Guide – identify several key component estimates that are necessary predicates to a valid analysis of available reserves on a given piece of property. For example, in estimating surface-mineable coal, the estimator must establish the "minimum bed thickness" and the "maximum overburden-to-coal ratio." Id. ¶¶ 24-25 (U.S. Ex. X, App. III at 611-12). Mr. Wiley never presents, and apparently never estimated, either of these critical components of a coal reserve analysis. Also, in estimating underground-mineable coal, the estimator must establish the "minimum bed thickness" as well as the "in-bed parting." Id. ¶ 23 (U.S. Ex. X, App. III at 611). The Wiley Report is completely devoid of these critical elements of a coal reserve estimation. Without these critical components, Mr. Wiley's coal reserve analysis represents nothing more than a guessing game.

Fourth, Mr. Wiley fails to provide an analysis of the reliability of his estimates and fails

to present the information that would be necessary for anyone else to independently assess the reliability of his estimates. As Mr. Stagg indicates, the generally accepted practice within the coal industry is to identify the reliability of coal estimates by categorizing the estimates as either "measured," "indicated," or "inferred." Id. ¶¶ 24-27 (U.S. Ex. X, App. III at 611-613). A "measured" estimate has the highest degree of reliability because it is based upon a greater concentration of actual measurements and thus a lower degree of extrapolation. Id. "Indicated" and "inferred" estimates are increasingly less reliable because they involve a decreasing concentration of actual measurements and an increasing level of extrapolation. Id. Because Mr. Wiley does not identify his estimates as either "measured," "indicated," or "inferred" and does not present the distances between his data points, the Court is unable to assess the reliability of his estimates, a critical part of the Daubert analysis.

Finally, Mr. Wiley does not apply his conclusions to the actual property at issue in this case. For example, Mr. Wiley states that the operations available for mining, given the OSM Designation, would not be economically feasible "[f]or **most** areas." Pls. Resp. Ex. 1, p. 3. Even if this conclusion – which is unsupported by any analysis, data, or citations to authority – were in fact true, Mr. Wiley never applies his general conclusion to the specific piece of property at issue in this case. It is not necessarily true that a technique that is uneconomic in "most areas" is uneconomic in every area or, more importantly, in this area.[5] In short, the conclusory and unsupported opinions offered by Mr. Wiley are exactly the type of opinions the Supreme Court

---

[5] Similarly, Mr. Wiley also bases his conclusions on his opinion that "**possible** subsidence" may occur as the result of underground mining. Even if relevant, this assertion of "possible" consequences, without any attempt to quantify the risk does not rise to the level of certainty related to the Wharton Property that is required for the admission of an expert opinion. Stagg Dec. at ¶28 (U.S. Ex. X, App. III at 613-14); Siddell Dec. II at ¶¶ 19-21 (U.S. Ex. V, App. III at 593-94).

meant to prohibit in Daubert.

Because the Court's jurisdiction "is always strictly construed . . . and is not to be extended by implication," the incompetent evidence of alleged futility presented by Plaintiffs must be rejected.  Catellus, 31 Fed. Cl. at 404 (citations omitted).  As such, because Plaintiffs have failed to apply for a permit, their takings claim is not ripe and must be dismissed by this Court.

> C.  The Ripeness Doctrine is Particularly Relevant to Complex Technical Claims, Such as the Claims in the Instant Case

The need for a ripe claim is particularly important in a case such as this where technical expertise regarding complex methods and types of coal mining are at issue and where it is undisputed that several types of mining may well be permitted on the property at issue.[6]  "[S]ince agency decisions are frequently of a discretionary nature or **frequently require expertise**, the agency should be given the first chance to exercise that discretion or **to apply that expertise**."  McKart v. United States, 395 U.S. 185, 194 (1969) (emphasis added).  In the instant case, OSM's review of a permit application required by SMCRA, will allow it to apply its specialized expertise to address all of the following potential mining operations which are not

---

[6] Without the final word from the administrative agency regarding the permitted use of the property, the Court will also be unable to conduct the sort of analysis that the Court is called to make under the Penn Central standards.  Palazzolo v. Rhode Island, 533 U.S. 606, 607-08 (2001) ("[a] final decision by the responsible agency informs the constitutional determination whether a regulation . . . defeated the reasonable investment backed expectations of the landowner to the extent that a taking has occurred" citing Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 124").  As the Supreme Court has said "[o]ur cases uniformly reflect the insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it."  Macdonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 351 (1986).  The Court has based this requirement on the fact that without a clear statement of the impact of the regulations as applied by the appropriate administrative agency, the court is left to guess as to the true impact of the regulations.  See id. at 348 ("A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes.").  By failing to apply for a permit, Plaintiff have deprived this Court of knowing the nature and extent of permitted development on the Wharton Property.  Had Plaintiffs applied for a permit, Plaintiffs and OSM – and the Court – "would know with substantial certainty the extent of mining operations" permitted on the Wharton Property after the OSM Designation.  Siddell Dec. II at ¶¶ 11-12.

precluded by the OSM designation:

1. A large portion of the Wharton Property lies outside of the Petition Area. Pls. Resp. at 5; Siddell Dec. II, Ex. 1 (U.S. Ex. V-1, App. III at 596). Mr. Douglas Siddell – Supervisor of the Technical Group in OSM's Knoxville Field Office – explains in his declaration that OSM will consider permit applications "for all surface coal mining operations (including surface and underground mining)" in this substantial portion of Plaintiffs' property. Siddell Dec. II ¶ 7 (U.S. Ex. V, App. III at 589-90).[7] In other words, all areas outside the Petition Area are unaffected by the OSM Designation. Id.

2. OSM will also consider permit applications "for all surface coal mining operations (including surface and underground mining)" in most of the Petition Area (i.e., all of the Petition Area that lies outside of the Hall, Middle, and Rock Creek gorges). Siddell Dec. II ¶ 7 (U.S. Ex. V, App. III at 589-90). In that portion of the Petition Area outside of the gorges, the only surface mining limitation applies to the Sewanee seam. Id. Plaintiffs' own alleged expert admits, however, that the Sewanee seam represents at most approximately 5.8 million tons of coal out of a possible 82.4 million tons. Pls. Resp. Ex. 1, p. 4. Moreover, outside the gorges, even the Sewanee seam can be surface mined if special overburden techniques are applied to the project and approved by OSM. Siddell Dec. II ¶ 7. This is the very sort of technical consideration that must be left to the agency as part of the permitting process before this claim can be considered ripe for judicial review.

3. In short, the only type of mining absolutely precluded by the OSM Designation is

---

[7]Even if the Court were to accept the conclusory allegations in the Wiley Report, 34.5 million tons of the total 82.4 million tons of coal that allegedly lie on the Wharton Property are outside of the Petition Area. Plaintiffs do not dispute that, even with the OSM Designation in place, they may well receive a permit to mine these 34.5 million tons. See also Stagg Dec. ¶ 29 (U.S. Ex. X, App. III at 614).

10

surface mining in the Hall, Middle, and Rock Creek gorges. As indicated on the map prepared by OSM and attached to Mr. Siddell's declaration, the gorges cover a relatively minor portion of the Wharton Property. Siddell Dec. II ¶ 5 and Ex. 1 (U.S. Exs. V & V-1, App. III at 588-89 & 596). Even the coal under the gorges can be mined using underground mining methods as long as there are no surface activities, or impacts of surface activities, within the gorges.[8] Id. at ¶¶ 6-7. The back-and-forth typical in the permit application process would assist in the definition of possible access points and the feasibility of such an approach. Id. at ¶¶ 11-12. Again, it is just this sort of technical and scientific process that is protected by the ripeness doctrine and should, in the first instance, be left to the specialized administrative agency to pursue.

      The numerous technical determinations identified above clearly support the conclusion that Plaintiffs' takings claim cannot ripen until Plaintiffs initiate and complete the permitting process. OSM's special expertise will allow it to address these many technical issues in a way that the Court cannot. Until such expertise is brought to bear on these technical issues, Plaintiffs' claims are not ripe for adjudication because, as the Supreme Court has said, "judicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to . . . apply its expertise." McKart, 395 U.S. at 194. Because Plaintiffs have not allowed OSM to apply its specialized expertise to a review of the required permit application, the instant taking claim is not ripe and must be dismissed.

---

[8] The Wiley Report suggests that underground mining in the designated area is not feasible because of "possible subsidence" and "probable hydrologic consequences." Pls. Resp. Ex 1, p. 3. Mr. Wiley seems to assume that the subsidence he predicts, with no data to support his conclusion, would be considered "surface coal mining operations" which are prohibited by the OSM Designation. This assumption, however, is faulty. OSM's regulations indicate that subsidence is not part of the definition of "surface coal mining operations." Siddell Dec. II ¶¶ 19-20 (U.S. Ex. V, App. III at 593). Thus, even if Wiley's predictions of subsidence are correct, this would not necessarily prevent OSM from issuing a permit to underground mine in the gorges. Id.; Stagg Dec. ¶ 28 (U.S. Ex. X, App. III at 613-14).

### D.  Plaintiffs' Letters to OSM Do Not Constitute the Application for a Permit Required by SMCRA and the OSM Regulations

Plaintiffs admit that they have never submitted an application to mine on the property at issue in this case. Proctor 02/14/06 Depo. 185:16-18 (U.S. Ex. K, App. II at 429). Moreover, at all times, Plaintiffs were on notice that a permit is a necessary prerequisite to mining the Wharton Tract. 30 U.S.C. § 1256(a). Not only did SMCRA and its implementing regulations put Plaintiffs on notice of the required permit, but on March 30, 2000, Beverly Brock, Supervisor in OSM's Technical Group in Knoxville, Tennessee, wrote to Mr. Proctor and provided detailed information regarding the application process as well as a one hundred page sample application. U.S. Ex. L, App. II at 435-37. Even after the detailed information contained in Ms. Brock's letter, Plaintiffs never filed an application to mine the Wharton Property. Siddell Dec. II ¶¶ 15-16 (U.S. Ex. V, App. III at 592).

Plaintiffs now attempt to excuse their failure to submit the required permit application by claiming that OSM failed to respond to general inquiries attempting to confirm that Plaintiffs had "exhausted [their] administrative remedies as the necessary prerequisite to seeking Judicial review."[9] Proctor "Jan. 7, 2002" Letter to OSM, Pls. Resp. Ex. 4. Simply put, this assertion is false. See generally Siddell Dec. II ¶¶ 23-28. OSM did respond to Mr. Proctor in a letter sent by OSM to Mr. Proctor by certified mail on February 1, 2002.[10] Id. ¶ 26. The letter specifically

---

[9] Frankly, it is not even clear from Mr. Proctor's letters exactly what type of "Judicial review" and "administrative remedies" he is referencing. In context, it appeared that Mr. Proctor was referring to a judicial challenge to the OSM desingation, not a taking claim in this Court. Siddell Dec. II at ¶ 28.

[10] Of course, OSM had neither the responsibility nor the expertise to advise Plaintiffs on the central inquiry of how to "exhaust their administrative remedies." Id. ¶ 28. The only relevant question in determining whether Plaintiffs' takings claim is ripe is whether Plaintiffs submitted a permit application that was denied. Plaintiffs' letters to OSM are telling, however, because they demonstrate that, long before any analysis of the economic use of their property (the Wiley Report is dated April 5, 2006), Plaintiffs were already attempting to avoid the required permitting process and to proceed prematurely to

12

denied that Plaintiffs had somehow exhausted their administrative remedies by sending the letters of general inquiry. Id. ¶ 27.

Given the detailed permit application information provided by OSM to Mr. Proctor on March 30, 2000, if Plaintiffs truly wished to mine the Wharton Property they should have proceeded to complete the application and submit it to OSM. Instead, Plaintiffs embarked on a letter writing campaign in an apparent attempt to ripen a takings claim while circumventing the required application process. None of the letters submitted by Plaintiffs to OSM even begin to meet the requirements of a permit application as required by the regulations. Id. ¶¶ 8-10. Moreover, Plaintiffs have provided no legal support for their apparent allegation that their letter writing campaign exempts them from the clear regulatory and statutory requirement of a permit application.

## II. SANTIAGO'S COMPLAINT IS BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS

### A. The Appropriate Standard For Determining Claim Accrual is Whether the Plaintiff "Was or Should Have Been Aware" of the Events Giving Rise to the Claim

The only acceptable test for claim accrual remains the test announced by the Federal Circuit in Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988). Santiago acknowledges as much when it approvingly cites to Hopland in its Response and states " [a] claim first accrues 'when all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.'" Pls. Resp. at 9 (emphasis in Pls. Resp.). After citing to this well-established and sole test for claim accrual, Santiago then proceeds to ignore the test and constructs, in its place, a due process claim, which

litigation against the United States.

is not justiciable in this Court.[11]

Rather than applying the sole claims accrual standard endorsed by the Federal Circuit, Santiago turns to a host of cases that address due process claims, not claim accrual. For example, in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950), the case primarily relied upon by Santiago, the Supreme Court found that due process rights protect a party against whom a judicial proceeding has been brought without notice to that party; that is, stealth litigation. In the instant case, the issue is the right of a party to initiate a suit versus the right to defend one's self, which was the situation in Mullane and the other cases cited by Santiago.[12] There is good reason why the due process standard in the cases cited by Santiago is not tantamount to claim accrual and should not be superimposed upon the Federal Circuit's long-standing claim accrual standard. Individuals in a defensive position should not be forced to take affirmative actions to learn of suits filed against them in federal courts. Conversely, it is reasonable to require that someone wishing to initiate an affirmative action against others take reasonable steps to protect their interests and file within prescribed statutes of limitations.[13]

---

[11] Santiago cites Electro-Methods, Inc. v. United States, 728 F. 2d 1471 (Fed. Cir. 1984), and ATL, Inc. v. United States, 736 F.2d 677 (Fed. Cir. 1984), in support of its assertion that the Court of Federal Claims has jurisdiction over due process claims. In fact, neither Electro-Methods nor ATL address the issue of whether the Court of Federal Claims has jurisdiction to hear a due process claim. Instead, in both cases the Federal Circuit affirmed the Court of Federal Claim's jurisdiction over implied-in-fact contracts between the United States and bidders for government contracts, not due process claims. Electro-Methods 728 F.2d at 1475; ATL, 736 F.2d at 681. Moreover, Santiago's reading of these cases is in direct contravention of Federal Circuit jurisprudence that directly addresses the issue of jurisdiction over due process claims and holds that the Court of Federal Claims has no jurisdiction over due process claims. LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995); see also Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 803 (Fed. Cir. 1993).

[12] Accord Walker v. City of Hutchinson, 352 U.S. 112 (1956), Jones v. Flowers, 547 U.S. ___, 126 S.Ct. 1708 (2006); Schroeder v. City of New York, 371 U.S. 208 (1962); Mennonite Bd. of Missions v. Adams, 462 U.S. 791 (1983).

[13] This distinction is also the basis for the holdings in Tulsa Professional Collection Services Inc. v. Pope, 485 U.S. 478, 486 (1988), and Texaco, Inc. v. Short, 454 U.S. 516, 533-34 (1982), both of which found

Moreover, the notice requirement in the OSM regulations, which is the focus of Santiago's argument, is not a claim accrual provision and is not intended to protect the right to judicial process. Instead, the OSM regulation is intended to provide notice to those who wish to participate in the administrative process. Indeed, it would be contrary to the separation of powers doctrine to conclude that OSM has the ability, through the promulgation of regulations, to somehow grant or modify jurisdiction of the judicial branch. The prerogative to set statutes of limitations, as the name implies, lies not with the executive branch, but with the legislative branch.

### B. Santiago Received Adequate Notice of the OSM Decision

In its response, Santiago attempts to minimize the very real factual distinctions between it and the Benchmark Plaintiffs, related to issues which this Court previously found to be critical to the statute of limitations issue. In its prior ruling this Court appeared particularly concerned by the fact that if OSM had researched the Benchmark deeds to the Wharton Property, it would have found an address for Benchmark itself. Benchmark Res. Corp. v. United States, 64 Fed. Cl. 526, 535 (2005). The same is not true for Santiago. Santiago's deeds contain no corporate address for Santiago.[14] The deed at the very **top** states as follows:

> Mail:   Joe G. Bagwell

---

that due process notice requirements do not apply to self-executing statutes of limitations. Plaintiffs attempt to distinguish these cases, arguing that the government had a much larger role in the instant case than in the cited cases. The critical governmental involvement in both Tulsa Professional and Texaco, however, was the government's involvement in failing to notify the party of judicial action. Here, there is no judicial action against the Plaintiffs and the involvement of OSM in the administrative proceedings is irrelevant in the context of claim accrual.

[14] Santiago suggests that the United States' statute of limitations argument is premised on the assertion "that Santiago's deed does not provide an address other than Mr. Bagwell's." Pls. Resp. at 13. This is not a correct presentation of the United States' position. The United States claims only that "Santiago's deed did not list its address" (U.S. Mot. at 35), which it does not.

15

>162 1st St. N.E.
>Cleveland, TN 37311

U.S. Ex. O, App. II at 459.  At the **bottom** the deed indicates the following:

>Tax Notice:    c/o Warshaw, Burnstein, Cohen & Kuh
>555 Fifth Ave.
>New York, NY 10017

Id.  There is no actual corporate address for Santiago in the deed.  Moreover, there is no reason from the face of the deed to prefer the generic law firm address in New York over Mr. Bagwell's address in Tennessee.  The generic law firm address is not placed prominently at the top of the document like Mr. Bagwell's and the generic law firm address indicates that it is purely for "Tax Notice" purposes.  Id.  Santiago argues that OSM should have known to prefer the generic law firm address over Mr. Bagwell's address because Warshaw Burnstein was "Santiago's long time attorneys."  Pls. Resp. at 13.  How Santiago believes that one could determine or know this fact from the information in the deed is beyond comprehension.  Indeed, Santiago relies upon nothing more than post-hoc deposition testimony by its own attorney to support this conclusion – information which was not available to OSM at the time the notices were sent.

The fact is that OSM sent notice to Santiago care of Mr. Bagwell.[15]  There is no basis to argue that this was somehow deficient.  First, Santiago's owner has testified at deposition that Mr. Bagwell was, in fact, Santiago's attorney and thus its agent for purposes of the Tennessee property.  Kwon Depo. 61:24-62:8 (U.S. Ex. R, App. II at 508-508a).  Second, Mr. Bagwell's address was the first and most prominent address contained in Santiago's deed.  U.S. Ex. O,

---

[15] Santiago makes much of the fact that there are no copies of the mailing labels used to transmit the final OSM notice of Decision in the OSM files.  Pls. Resp. at 14-15.  The only evidence in the record, however, suggests that the same labels were used for the notice of Decision and the final PED/EIS.  Siddel Dec. I at ¶ 13 (U.S. Ex. B, App. I at 342).  Further, the labels used for the PED/EIS included labels for Santiago care of Joe Bagwell.  Id. at ¶ 12.

16

App. II at 459.  Third, the OSM mailing list indicates that notices were sent to Santiago care of Mr. Bagwell.[16/]  U.S. Exs. B-6 & B-7, App. I at 376, 378.  This is distinct from the situation which troubled the Court regarding the Benchmark Plaintiffs, whose corporate names did not appear on the notices sent to Mr. Bagwell.

The overwhelming evidence in the record demonstrates that notice was sent to Santiago care of its agent.  Even if the notice requirements of the OSM regulations apply to claim accrual, OSM met its obligations under the regulations with respect to Santiago.  As such, Santiago knew or should have known about the OSM designation at or about the time it was issued in 1987, and its complaint filed in 2005 is well beyond the applicable six year statute of limitations and must be dismissed.

### III.   PLAINTIFFS POSSESSED NO RIGHT TO SURFACE MINE COAL ON THE WHARTON PROPERTY AT THE TIME OF THE ALLEGED TAKING

#### A.   The Timber Lease Property

Plaintiffs argues that they possessed a right to strip mine on the timber lease property because the contract left open the possibility of future negotiations for mining operations.  The potential to negotiate for the future right to conduct mining operations is not, however, a cognizable property interest.  Such future potential negotiations are far too speculative to represent a compensable property interest on the date of the alleged taking.  As well-established case law demonstrates, the claimant must hold the property interest at the time of the alleged taking, not at some potential future time.  Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir.

---

[16/]Santiago makes much of the fact that the OSM mailing list contained a one letter typographical error in the spelling of the company name: "Santiaco" versus Santiago. Pls. Resp. at 15.  This argument demonstrates how desperate Santiago is to avoid the consequences of their own failure to meet the statute of limitations in this case.  Surely the Court will not ignore a notice sent to a person who is admittedly an agent of the company and whose address appeared prominently on the property deed purely because of a one letter typographical error in the corporate name.

2001) ("[i]t is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation") (citations omitted); Cienega Gardens v. United States, 331 F.3d 1319,1328 (Fed. Cir. 2003) ("[f]or any Fifth Amendment takings claim, the complaining party must show it owned a distinct property interest at the time it was allegedly taken, even for regulatory takings").

### B.     The Coal Lease Property

A 1977 lease between Plaintiffs and Tennessee Partners, Inc., which had a term of twenty years, gave to Tennessee Partners "the right to remove **all coal** from the lands owned by [Plaintiffs]." U.S. Ex. U, App. II at 569 (emphasis added). Put simply, Plaintiffs had no right to mine the Wharton Property in 1987.

Plaintiffs make much of the potential "reversionary interest" and "claim for royalties" on the Wharton Property under the lease with Tennessee Partners. Pls. Resp. at 16. Plaintiffs' Complaint, however, does not claim a taking of a reversionary interest or a right to royalties. Instead, in their Complaint, Plaintiffs allege only that the United States "effectively prohibit[ed] Plaintiffs from mining . . . coal reserves located on the Property. . . ." Compl. at ¶ 25. Because the Complaint does not allege a taking of a reversionary interest or a right to royalties, the Complaint filed by Plaintiffs must be dismissed.

Indeed, Plaintiffs do not refute that on the date of the alleged taking – March 24, 1987 – they possessed no right to mine coal on the Wharton Property as a result of the lease with Tennessee Partners. Instead, Plaintiffs argue that, at some point in time after March 24, 1987, they might possibly have obtained the right to mine the Wharton Property. The mere potentiality of some future right to mine property, however, does not represent a compensable property interest.

Moreover, the United States did not interfere with any reversionary interest held by Plaintiffs in 1987. First, Plaintiffs reversionary interest in 1987 was the mineral interest in the property less **all coal**. The OSM Designation did nothing to interfere with this interest. As Plaintiffs acknowledge, they were the owner of nothing more than a non-participating royalty interest in 1987. Second, "[t]he owner of a non-participating royalty interest does not have the power to develop the mineral fee estate." Cane Tenn. Inc. v. United States, 60 Fed. Cl. 694, 699 n. 7 (2004). As a non-participating royalty holder in 1987, Plaintiffs had no right to mine for coal on the Wharton Property and, thus, cannot allege that the ability to mine the property was taken from them by the United States.

Similarly, the United States did not interfere with any Royalty payments from the lessee to Plaintiffs. "The only right reserved [in the non-participating royalty] is the right to receive royalty from the exploitation of the mineral estate." Id. at 699, citing J.M. Huber Corp. v. Square Enterprises, Inc. 645 S.W.2d 410, 412 (Tenn. Ct. App. 1982). In fact, Plaintiffs have already sued and reached a settlement with Tennessee Partners over the royalty payments. Pls. Resp. at 17, n. 4.

Because Plaintiffs possessed no right to conduct surface coal mining operations on the Wharton Property in 1987, when OSM issued its Designation, they cannot claim that the United States took that right from them. In addition, the United States did not interfere in any way with alleged reversionary interests or royalty payments, which are not even mentioned in Plaintiffs' Complaint. Given that Plaintiffs possessed no property interest in 1987, their taking claim must be dismissed for failure to state a claim upon which relief can be granted.

## **CONCLUSION**

Plaintiffs cannot prove that their claim is ripe and Plaintiff Santiago cannot prove that it

filed its action within the applicable limitations period. As such, the United States respectfully requests that the Court dismiss Plaintiffs' Complaint. In the alternative, because Plaintiffs lacked a cognizable property interest to mine the Wharton Property, the United States respectfully requests that the Court grant the United States' request for summary judgment.

September 28, 2006                                    Respectfully submitted,

                                                      SUE ELLEN WOOLRIDGE
                                                      Assistant Attorney General
                                                      Environment and Natural Resources Div.

                                                              /s/
                                                      _____
                                                      JAMES D. GETTE
                                                      Trial Attorney
Of Counsel:                                           Natural Resources Section
Daniel W. Kilduff                                     Environment and Natural Resources Div.
U.S. Dept. of the Interior                            United States Department of Justice
Office of the Solicitor                               P.O. Box 663
1849 C Street, N.W.                                   Washington, D.C. 20044
Washington, D.C. 20240                                (202) 305-1461