**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BENCHMARK RESOURCES ) <br> CORPORATION, GENTRY ) <br> CORPORATION, and SUNRISE ) <br> HOLDING, INC., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES OF AMERICA, ) <br> ) <br> Defendant. ) <br> ) | No. 03-178L <br><br> Honorable Christine Odell Cook Miller |

**PLAINTIFFS' SUR-REPLY RE: DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Pursuant to Order of the Court dated October 2, 2006, Plaintiffs file their Sur-Reply re: Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment.

Defendant asserts alternatively that this Court does not have jurisdiction to decide the present matter and/or that there are no genuine issues of material fact such that summary judgment is appropriate. Plaintiffs recognize that they have the burden of establishing subject matter jurisdiction. Myers Investigative & Sec. Servs., Inc. v. United States, 275. F.3d 1366, 1369 (Fed. Cir. 2002). In considering a jurisdictional challenge, however, the court's "task is necessarily a limited one" because "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes,

416 U.S. 232, 236 (1974), *overruled on other grounds by* Harlow v. Fitzgerald, 457 U.S. 800. Further,

> . . . when ruling on a jurisdictional motion involving factual issues which also go to the merits, the trial court should employ the standard applicable to a motion for summary judgment. Under this standard, the moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.

Trentacosta v. Frontier Pac. Aircraft Indus. Inc., 813 F.2d 1553, 1558 (9th Cir. 1987) (numerous citations omitted).

Defendant would have the Court umpire a "battle of experts" in order to dismiss the instant Complaint. Plaintiffs are cognizant that at trial, the fact finder will have to determine the ultimate economic impact Plaintiffs suffered in order to determine whether a taking has occurred. This will of necessity involve additional discovery and far more extensive expert opinions. For the moment, Defendant has elected to file a motion to dismiss based upon threshold jurisdictional issues. Based upon Defendant's decision to resolve jurisdictional matters piecemeal, the Court's scheduling orders do not yet address discovery on the ultimate issue of whether or not a taking has occurred.

The issue before the Court is not whether Plaintiffs have advanced sufficient evidence to prove a taking, but rather, are the Plaintiffs entitled to present such evidence? Scheuer, *supra*. In considering this issue, all of the evidence should be considered in a light most favorable to Plaintiffs and the motion must be denied unless there are no genuine issues of material fact. Trentacosta, *supra*.

Plaintiffs have shown that the case is ripe. It would be futile for them to apply for a mining permit at this juncture because "the designation by OSM of unsuitability within the Rock Creek watershed boundary essentially eliminates the viability of mining the entire Wharton

tract." (Declaration of Marcus Wiley, attached to Appendix hereto, as Exhibit "1" at ¶14). Further, for the reasons set forth in Plaintiff's Response to the present motion, and for the same reasons enunciated by this Court with respect to the government's previous failed motion to dismiss Benchmark's claims, Santiago's cause of action is timely. Finally, regardless of the value ultimately ascribed to the property taken by Defendant, Plaintiffs unquestionably held a valid property interest in the property taken by the United States at the time of the alleged taking.

## I.     PLAINTIFFS' CLAIMS ARE RIPE

Defendant argues that it would not be futile for Plaintiffs to file a mining permit because, according to Doug Siddell, OSM has allegedly "granted more than 80% of the new permit applications accepted for processing and on which it rendered a decision." (Def. Reply at p.3, n.2). It is noteworthy that Mr. Siddell does not state that OSM has ever granted or even processed any permit applications to mine any property within the Designated Area. More importantly, it is undisputed, even in light of the declarations of Mr. Siddell and Mr. Stagg, that OSM would certainly **not** grant a mining permit for at least a portion of Plaintiffs' property: the Decision categorically precludes surface mining and underground mining having surface effects in the Hall, Middle, or Rock Creek Gorges. In other words, Plaintiffs have undeniably suffered a present curtailment of their property interests. Whether that curtailment is sufficient to rise to a taking is not before the Court and must be decided hereafter. In the interim, Plaintiffs have also provided competent, admissible evidence that it would be futile for Plaintiffs to apply for a mining permit as to any portion of their property—even if Defendant had granted 100% of all mining permit applications as to property outside of the Designated Area. The Court must deny the government's instant motion.

A.    **This Case is Ripe for Review-- In the Alternative, the Futility Exception to Ripeness Applies.**

The government asserts that: (1) this case is not ripe for review; and (2) the futility exception to the ripeness doctrine does not apply in the instant case. Previously, in this same case, the government argued and presented evidence demonstrating, that "all events which fix the government's alleged liability have occurred. . ." *See*, Defendants' [First] Motion to Dismiss Under 12(b)(1) at 16; see, also, e.g., Benchmark v. United States, 64 Fed.Cl. 526, 532 (2005) (all parties agreed that "cause of action accrued" in 1987). If, indeed, all events which fix the government's alleged liability have occurred – as the parties previously agreed and this Court so found – then this case is ripe for review.

Notwithstanding the foregoing, the government misstates applicable law, relying rather on generalities, and proceeds to apply these generalities to a distorted recitation of the facts of this case. There is no support for the Procrustean arguments of the government, even if artfully crafted. The instant matter is ripe for review. In the alternative, the futility exception applies. As set forth below, defendant is not entitled to either dismissal or summary judgment in its favor – especially when all inferences, presumptions, and any doubts about factual issues are drawn in plaintiffs' favor. *See*, Cane Tennessee, Inc. v. U.S., 57 Fed. Cl. 115, 120 (2003).

1.    **This Case is Ripe for Review**

The government argues that this case cannot be ripe because the plaintiff has not applied for a permit. Reply at 2, citing Heck & Assocs. Inc. v. U.S., 134 F.3d 1468, 1472 (Fed Cir. 1998), but, *c.f., e.g.*, Anaheim Gardens et al. v. U.S., 444 F.3d 1309, 1316 (Fed Cir. 2006) ("the ripeness doctrine does not require a landowner to submit applications for their own sake."); Washoe County, Nevada v. U.S., 319 F.3d 1320, 1324 (Fed. Cir. 2003) (Same). While denial of

a permit is often the precursor to ripeness, it is neither a necessary element of ripeness, nor part of the actual test for ripeness, in a takings claim such as this one.

In reality, a takings claim is ripe when "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Thus, "once . . . the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." Palazzolo v. Rhode Island, 533 U.S. 606, 619-620, 121 S.Ct. 2448, 2458-2459 (2001); Cooley v. U.S., 324 F.3d 1297, 1301 (Fed. Cir. 2003) (same); Washoe County, Nevada v. U.S., 319 F.3d 1320, 1324 (Fed. Cir. 2003) (same); Beekwilder v. U.S., 55 Fed. Cl. 54, 60 (2002) (same).

This case was ripe for adjudication shortly after the Statement of Reasons was issued by the Office of Surface Mining in March, 1987. i.e., all events which fix the government's alleged liability have occurred. On March 24, 1987, the OSM issued a Decision on the Petition, whereby it designated certain property within the Petition Area as unsuitable for surface coal mining operations. This included designating "[a]ll surface minable reserves of the Sewanee seam within the Rock Creek watershed, Tennessee as unsuitable for coal mining operations using conventional overburden mixing techniques for reclamation" and the "Hall, Middle, and Rock Creek gorges as unsuitable for all surface coal mining operations and surface disturbance incident to underground mining." Benchmark, 64 Fed.Cl. at 529 *quoting* Decision, OSMRE, Mar. 24, 1987. This acknowledged final agency action further provides, in part, that:

> [a]pplications proposing surface mining operations and underground mining operations having surface effects in the designated portions of the gorges would be denied.

Statement of Reasons.

In short, in the instant case: (1) the target agency reached a final decision regarding application of the regulations to the property at issue; and (2) the permissible uses of the property are known to a reasonable degree of certainty. This case is ripe for review.

### a. The Permissible Uses of the Portion of Plaintiff's Property That are Outside the Petition Area are Known to a Reasonable Degree of Certainty

The government further argues that this case cannot be ripe because plaintiffs have not applied for a permit *vis-à-vis* property outside of the Petition Area. Reply at 3. Again, as discussed *supra*, the government's argument that a permit application is a necessary element of ripeness is not legally correct. Here, the permissible uses of the portion of plaintiffs' property that are outside the Petition Area are known to a reasonable degree of certainty.

Notwithstanding the foregoing, to support its "permit requirement" argument, the government avers that Cane Tenn. Inc., v. U.S. is "virtually identical to the case at bar." Reply at 3. As set forth above, Cane does not apply the test for ripeness that is applicable in the instant case. The Cane case is, however, further distinguishable. For example, the Unsuitability Determination at issue in Cane "only precludes surface coal mining within the designated area. . . ." Cane, 57 Fed. Cl. 115, 130 (2003). According to the court in Cane, "[b]ecause the scope of the Secretary's decision is clearly delineated in his letter of decision, the court cannot now find that the Unsuitability Determination somehow prohibits mining in the viewshed area (outside the designated area)." In the instant case, the Secretary's decision is not so "clearly delineated." Indeed, the Secretary specifically precludes any "surface mining operations and underground mining operations having surface effects in the designated portions of the gorges. . ." Statement of Reasons (emphasis added).

More importantly, however, the government use of Cane, which was largely a decision on the merits, misses the mark *vis-à-vis* ripeness. For example, in Palazzolo, the Supreme Court

specifically addressed ripeness in the context of a plaintiff's failure to apply for a permit to develop land outside of the regulated area. According to the Supreme Court:

> [i]n assessing the significance of petitioner's failure to submit applications to develop the upland area it is important to bear in mind the purpose that the final decision requirement serves. Our ripeness jurisprudence imposes obligations on landowners because '[a] court cannot determine whether a regulation goes 'too far' unless it knows how far the regulation goes." (Citation Omitted). Ripeness doctrine does not require a landowner to submit applications for their own sake. Petitioner is required to explore development opportunities on his upland parcel only if there is uncertainty as to the land's permitted use.

Palazzolo, 533 U.S. at 622, 121 S.Ct. at 2460.

In the instant case, there is no uncertainty as to the land's permitted use. The parties know which land has been withdrawn by designation. The question of whether or not that constitutes a taking is not at issue in this motion.

Moreover, plaintiffs previously presented the report of Arthur Thompson, Professional Engineer with Mineral Associates, Inc. dated January 10, 1982. In that report, Mr. Thompson presented credible evidence that OSM's decision rendered plaintiffs' entire property virtually worthless. The facts supporting this proposition were, in part, identified by this Court when it stated that "[t]he OSM's Decision renders plaintiffs unable to mine their land, nor can they recover any portion of this value." Benchmark, 64 Fed.Cl. at 530.

In response to the instant motion, plaintiffs presented further evidence from Mr. Wiley, that supports the conclusions based on Mr. Thompson's report. Mr. Wiley points out that a total of 51% of the coal is contained within the watershed boundary. An additional 7% is in resulting fringe areas too small or remote to mine alone. This leaves 42% of the coal resources. As pointed out in Mr. Wiley's report, this approximately 42% of coal reserves was rendered un-mineable by the Designation because, *inter alia*, of the non-congruency of the reserves left outside of the watershed boundary. Mr. Wiley further clarifies that while there may be

underground mineable coal seams that outcrop outside of the watershed boundary, old abandoned coal mines are located all along the outcrop area. This, according to Wiley, prevents access to the coal behind the old mines and would therefore require access from the other side of the mountain thus disturbing the watershed with surface disturbances related to underground mining which is prohibited. This coal simply cannot be mined. Whether or not plaintiffs applied for a permit is a non-issue.

### 2. In the alternative, Assuming, Arguendo, That This Case is Not Ripe, the Futility Exception Applies

Notwithstanding the government's assertions to the contrary, "[t]he futility exception to the ripeness doctrine recognizes that ripeness is not a mechanical or formalistic concept. If submitting an application or taking a step in an administrative process would serve no purpose then its avoidance will not defeat ripeness." Beekwilder, 55 Fed. Cl. at 61, citing, in part, Heck and Assocs. v. U.S., 134 F.3d 1468, 1472 (Fed Cir 1998), but, *c.f.. government use of* Heck, discussed *supra*.

To support its claim that the futility exception does not apply in the instant case, the government avers that: (1) the exception cannot apply when plaintiffs have not filed a permit application; and (2) "Plaintiffs' attempt to craft an 'economic futility' argument" is unavailing. Reply at 2-4. As addressed supra, there is no obligation to file a permit application where such an application would be to no avail, i.e., futile. See discussion *supra* (not feasible to mine even if a permit was available).

Finally, plaintiffs are not making an "economic futility" argument. The government's claim, that "[i]n Morris v. United States, the plaintiffs raised a similar argument in an attempt to stretch the futility exception past its intended limits. . ." is misplaced. See Reply at 4.

In Morris v. U.S., the plaintiffs asserted that they should not have to apply for a permit "because the cost of the permitting process exceeds $10,000 and is greater than the value of their property." Morris v. U.S., 392 F.3d 1372, 1375 (Fed. Cir. 2004). The cost of a permitting process has never been raised by the plaintiffs in the case at bar. Indeed, the only remotely related economic claim goes largely to the merits of this case, not ripeness. In the instant case, plaintiffs have averred that, because of the designation at issue, they have been deprived of the economic viability of their property. Here, regardless of the cost of a permit, if applying for and/or receiving a permit had any bearing on the facts, plaintiffs would apply. Such application in the instant case is, however, futile.

This case is ripe for review. There has been final agency action directed at the property and the permissible uses of the property are known to a reasonable degree of certainty. In the alternative, it would be futile for the plaintiffs to pursue further administrative solutions, i.e., apply for a permit. The government's motion should be denied and this case should be allowed to proceed on the merits.

### B.  **Plaintiffs Have Presented Sufficient Evidence of Futility**

Interestingly, Defendant chides Plaintiffs for "craft[ing] an 'economic futility' argument" only to contend two paragraphs later that "Plaintiffs have not provided competent proof of economic futility." (Def. Reply at p. 4). Plaintiffs will respond to each of these conflicting contentions: (1) as set forth above, the case is ripe for adjudication; alternatively, the doctrine of futility applies to the instant case; and (2) as set forth below, Plaintiffs have advanced sufficient evidence to withstand a jurisdictional challenge, such that they are entitled to proceed to a trial on the ultimate question of whether a taking has occurred.

1.  **Mr. Wiley is a Competent Witness and has Provided a Sworn Declaration**

While trumpeting the exploits of their witness, Alan Stagg, Defendant urges the Court to completely disregard Marcus Wiley, the Plaintiffs' expert. This "battle of experts" argument is better served in a closing argument at trial and not at a jurisdictional challenge at the outset of the case. Moreover, as set forth in Mr. Wiley's sworn declaration attached hereto as Exhibit "1," he is unquestionably a competent witness to testify as to the matters set forth in his report: (1)Mr. Wiley is a registered professional engineer with extensive experience in mine engineering and management; (2)Mr. Wiley is an instructor at the Colorado School of Mines where he has taught courses in Coal Mining Methods and Mine Valuation; and (3)Mr. Wiley has served as a mining consultant for over 25 years during which time he has provided the mining industry with mine planning, economic evaluations, project management, feasibility studies, due diligence analysis, geologic mapping, reserve studies, litigation support, and other professional mining related services.[1] In short, Mr. Wiley's work is respected in the mining industry as is Mr. Stagg's; indeed, they share a common client.

2.  **The Wiley Report Constitutes Admissible Evidence**

Defendant next argues that the Wiley Report is inadmissible because it supposedly does not estimate such geologic matters as "minimum bed thickness" or "in-bed parting" and whether the estimates are "measured," "indicated," or "inferred." At the outset, it must be noted that in a classic case of the pot calling the kettle black, Mr. Stagg's report offers no opinions on these matters either. Ironically, although Mr. Stagg recites that he independently "evaluated the coal potential of the Wharton Property during the late 1970's," he has not offered this underlying

---

[1] Mr. Wiley's CV, attached to his sworn declaration, may not be as verbose as Mr. Stagg's. Fortunately, the relative length of the parties' experts' resumes is not a basis for dismissing a lawsuit.

evaluation to the Court. By not providing this report, one can only deduce that his report is consistent with Mr. Wiley's conclusions or that his report would not survive the scrutiny he now applies to Mr. Wiley's instant declaration. In any event, both because it is undisputed that Plaintiffs are unable to mine at least a portion of their property and because Plaintiffs have presented a prima facie case that it would be futile to mine any portion of their property, it is premature to dismiss Plaintiffs' Complaint. In the interim, by way of response to Defendant's specific contentions, however, Plaintiffs state as follows.

First, Mr. Wiley has visited the Wharton Tract but he did not independently take the measurements referenced in his report; rather, Arthur Thompson did.[2] Mr. Thompson's work was detailed in this regard: he analyzed coal intercepts of 172 drill and core holes, took 76 additional coal measures from outcrops on the property, and made numerous measurements of coal thickness from abandoned mines and elsewhere on the property. (Wiley Declaration at ¶3). The government further provided additional measurements in its Economic Impact Statement prior to issuing the underlying Decision. Besides his independent experience in this area, Mr. Wiley relied on both the EIS and Mr. Thompson's geologic data in formulating his opinions in light of the Decision.

Mr. Stagg does not challenge the detailed estimates referenced in the Thompson Report or the EIS. In fact, Mr. Stagg does not state that he even examined either of these source documents. By not (1)providing his earlier report, (2)independently examining the subject property, or (3)relying on underlying geologic data, it is unclear how Mr. Stagg can reasonably challenge Mr. Wiley's opinions. Indeed, Mr. Stagg's critique of the Wiley Report is similar to a

---

[2] The Thompson Report has previously been submitted to the Court, without objection by Defendant. See e.g., Plaintiffs' Response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed on or about June 24, 2004, at pp. 11-12, ¶32; Appendix to Joint Preliminary Status Report at Tab 1; Benchmark, 64 Fed.Cl. at 530).

linguist finding fault with a translated document, without considering the original document itself.

Second, Mr. Wiley's conclusions are logical, independently verifiable, and are consistent with industry standards. The Wiley Report first calculates both the total coal resources and the total recoverable resources in the Wharton Tract. Next, the Wiley Report calculates the coal resources that lie within the Rock Creek Watershed. Lastly, the Wiley Report explains how the Decision affects the ability to mine the Wharton Tract, including property located within and without the Rock Creek Watershed.

### *Calculation of total coal resources and total recoverable coal resources in the Wharton Tract*

Based on the maps prepared by Mr. Thompson, and re-calculated by Mr. Wiley, there are 149 million total tons of surface and underground coal in the Wharton Tract. Based on Mr. Wiley's own personal experience with thin seam coal contour strip mining methods, Mr. Wiley estimated that it would be possible to recover 90% of available surface resources. This is less conservative than either Mr. Thompson who used a 75% recovery factor in his report, or OSM which used a recovery factor of 80% in the Environmental Impact Statement. Mr. Wiley further estimated that it would be possible to recover 50% of underground indicated resources. This is more conservative than Mr. Thompson who used 60% and exactly the same as OSM, which also used a 50% recovery factor to estimate recoverable resources in the EIS. Based upon these assumptions, recoverable resources (reserves) were estimated at 17.7 million tons by surface mining methods and 64.7 million tons recoverable by underground mining methods for a total Wharton tract property of 82.4 million tons recoverable. This is comparable with the Thompson evaluation which reports in-place resources (both proved and probable) of 142.1 million tons and recoverable of 84.6 million tons. (Wiley Affidavit at ¶7).

*Calculation of resources lying directly within the Rock Creek Watershed*

Mr. Wiley determined that Plaintiffs owned a total of 42.2 million tons of surface and underground coal within the Rock Creek Watershed. The EIS recites that a total of 47 million total tons of coal lie within the Rock Creek Watershed. (Wiley Affidavit at ¶9). This of course confirms that Plaintiffs, who were by far the largest owners of coal in the Rock Creek Watershed, suffered most from the Designation.

Wiley noted further, however, that by the removal of the ability to mine coal contained within the Rock Creek watershed boundary, additional fringe areas or small reserve fragments would be unable to be mined. These areas are outside of the watershed boundary and inside the Wharton tract property. These small areas would not be economically mineable due to their size, location or ability to provide sedimentation control, road access or other obstacles to mining. A total of 0.6 million tons of surface mineable coal would be classified as sterilized for mining purposes, and an additional 5 million tons of underground coal would not be recoverable. This is an additional 5.6 million tons of coal that has been sterilized by the designation of the Rock Creek watershed boundary. Thus, total reserves affected by the designation of the Rock Creek watershed boundary as unsuitable for surface mining and the surface disturbance related to underground mining are 11.5 million surface tons and 36.4 million underground tons for a total of 47.9 million tons. (Wiley Affidavit at ¶8).

### *Effect of Decision as to Plaintiffs' property within the Rock Creek Watershed*

Certain of Plaintiffs' property lies directly within the Rock Creek Watershed. Wiley opined that through the Decision, OSM has removed from the Wharton tract, a total of 47.9 million tons of coal from the viability of mining.

Wiley acknowledged that while the OSM designation decision states that the Sewanee coal seam could be mined using some unconventional overburden mixing technique for reclamation, such a technique is not a viable option. In a contour mining environment, it is very difficult to separate acid forming overburdens and maintain assurance that no exposure to water will occur, thus preventing acid runoff. Without proper assurance ahead of mining, the permitting agency is reluctant to approve the mining plan. Even if a permit could theoretically be obtained, however, multiple seams need to be mined together to provide acceptable economic limits.

The Hall, Middle, and Rock Creek drainages are designated as unsuitable for all surface mining operations and surface disturbances from underground mining by OSM, and these drainages contain most of the surface mineable coal on the Wharton tract and overlay most of the underground coal as well.

Wiley further noted that due to the potential surface impact from underground mining, such as possible subsidence and probable hydrologic consequences, the underground mining of coal from areas contained within the Rock Creek watershed boundary are also precluded from mining due to the OSM designation of unsuitability within the drainage areas. Again, although OSM says that a permit can be submitted in these areas for underground mining, due to the restrictions set forth in the Decision, Wiley opined that it would be impossible to commit to a

plan to mine underground coal within the Rock Creek Watershed that does not have surface disturbance within the Hall, Middle and Rock Creek gorges.

### *Effect of Decision as to Plaintiffs' property outside the Rock Creek Watershed*

Certain of Plaintiffs' property lies outside of the Rock Creek Watershed. Based upon the coal resource tonnages, a total of 51% of the coal is contained within the watershed boundary and an additional 7% that is in fringe areas too small or remote to mine alone for a total of 58%. This leaves 42% of the coal resources available for mining, however, due to the configuration and non-congruency of the remaining reserves outside of the watershed boundary, a sensible mine plan cannot be prepared and submitted for these reserves either. The underground mineable coal seams outcrop outside of the watershed boundary and would normally provide the access to the reserves contained within the boundary areas, however in this instance old abandoned coal mines are located all along the outcrop area. This prevents access to the coal behind the old mines and would therefore require access from the other side of the mountain thus disturbing the watershed with surface disturbances related to underground mining, which is prohibited by the Decision. An access drift could be developed above the old mines, but such access would not be economically feasible for the divided tracts of coal remaining.

Wiley therefore concludes that by the removal of 47.9 million tons in the center of the reserve, the overall impact to the property is that not enough coal is left contiguously mineable to amortize the capital cost for infrastructure (office, shop, warehouse, coal preparation plant, portal, ventilation, rail access, load-out, employee training, continuous miners, belt haulage, surface mining equipment, sediment control, etc.) to justify mining any tonnage at all. Mr. Thompson provided economic analysis as of 1982 and reported the viability of mining these properties based upon the availability of the entire tract of coal resources. Wiley's personal

experience with clients looking for property today is that although small tracts of coal are mined in currently active areas, companies need at least a block of 100 million tons to justify full infrastructure in inactive areas such as is the case in Tennessee.

Thus, the designation by OSM of unsuitability within the Rock Creek watershed boundary eliminates the viability of mining the entire Wharton Tract. This conclusion is markedly different from the pre-Decision report authored by Mr. Thompson who opined that "the Wharton property remains as one of the largest undeveloped coal reserves in the southern Tennessee coal field. The seams that are contained on the ownership are considered premium coals that command premium prices. . . . all coals that occur on the Wharton Property can be easily marketed in a highly competitive sellers market." But for the Decision issued in this instance, Mr. Wiley's conclusion as to the mineability of the Wharton Tract would mirror Mr. Thompson's. Prior to the Decision, Benchmark et al. owned extremely valuable mining resources. Today, because of the Decision, the Wharton Tract has no practical value for mining purposes.

As noted above, Plaintiffs previously submitted the Thompson Report. Based on the calculations and facts set forth therein, the Court found that "OSM's Decision renders plaintiffs unable to mine their land."(Decision at 6). Of course, the Thompson report is still in evidence. Plantiffs have actually supplemented that report with Wiley's affidavit.

Mr. Stagg does not specifically state that he disagrees with any of Mr. Wiley's contentions referenced above. Rather, he simply recites that he does not believe it is possible for Mr. Wiley to reach these conclusions. Of course, without the underlying detailed geologic data, these conclusions could not have been independently reached. It is also readily apparent that additional discovery and expert reports, including Plaintiffs' deposition of Mr. Stagg in the event

he reaches conclusions contrary to Mr. Wiley's, will have to be obtained. Because Mr. Wiley's conclusions as applied to the Wharton Tract, and based on source documents apparently not considered by Mr. Stagg, provide a prima facie case of futility, and for the reasons discussed above, Plaintiffs' claims are ripe for adjudication. Defendant's Motion to Dismiss must be denied and Plaintiffs are entitled to present additional evidence on the ultimate issue of whether a taking has occurred.

## II.     SANTIAGO'S COMPLAINT IS TIMELY

Defendant next faults Plaintiffs (and by implication, the Court), for relying on Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950) and its progeny in support of the fact that Santiago's complaint is timely. As previously found by the Court, these cases "elucidate the level of acceptable notice that is comparable to the current situation." Benchmark, 64 Fed.Cl. at 534. In previously arguing that Benchmark's complaint was untimely, Defendant placed great emphasis on letters written by Benchmark in February 1985 and August 1985. Defendant contended that, based on these letters, Benchmark had actual knowledge of the Decision. Here, there is no allegation that Santiago wrote to OSM prior to the time the Decision was issued, or that Santiago otherwise had actual knowledge of the Decision prior to 2001. In fact, other than its stubborn insistence that Joe Bagwell was Plaintiffs' agent, an allegation that has previously been rejected by this Court, see Benchmark, 64 Fed.Cl. at 533, n. 12, Defendant does not assert that Santiago had actual knowledge of the Decision at all.[3]

---

[3] As the court will recall, well before the instant lawsuit was filed, Joe Bagwell told others that he was "more or less an escrow agent for the current owners of the Wharton tract. I collect rent from Bowaters for the surface use of approximately 7,000 acres of land in Bledsoe County and pay the taxes on the minerals of the 7,000 acres as well as on the minerals under several thousand acres of property in Hamilton County." (Plaintiffs' Response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed on or about June 24, 2004, at p. 9, ¶17). Santiago's representative has confirmed this in the instant Response. (Plain. Resp. at 15).

Mr. Siddell's most recent declaration recites that OSM cannot locate letters sent by Darold Proctor in November 2001 and January 2002. (Siddell at ¶24). Similarly, OSM's letter dated February 1, 2002, attached to Mr. Siddell's Second Declaration, states that other than a letter from Mr. Proctor dated August 11, 1985, OSM could find "no further communication" from Mr. Proctor. This of course ignores Mr. Proctor's February 1985 letter that OSM similarly "misplaced." Given these and the other clear errors in the unsuitability petition process previously identified by Plaintiffs in their Response, the Court should not be inclined to conclude that OSM ever mailed the Decision to Santiago, especially where OSM cannot identify the mailing labels used for this purpose, and where Joe Bagwell has stated that, with the possible exception of the initial Notice of Petition, he did not receive any other correspondence (including the Decision) from OSM. (See Plaintiffs' Response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed on or about June 24, 2004, at p. 14, ¶41). The government's insistence to the contrary demonstrates how desperate it is to avoid the consequences of its own failure to provide adequate notice to Plaintiffs, the largest landowners in the Designated Area.

Further, for the same reasons found by the Court as to Benchmark, the Defendant's attempt to impute constructive knowledge to Santiago is constitutionally infirm. Santiago filed its claim within 6 years after it knew or should have known of the Decision.

### III. PLAINTIFFS HAVE A COMPENSABLE PROPERTY INTEREST IN THE WHARTON TRACT

Defendant has offered no additional evidence in support of its argument that Plaintiffs had absolutely no property interest in the Wharton Tract such that no taking could possibly have occurred. As noted, it is undisputed that after leasing the property in this instance, Plaintiffs retained ownership of the property and possessed, *at a minimum*, an enforceable reversionary interest and/or a claim for royalties from the mining efforts of others.

As a final last ditch attempt to avoid the consequences of its actions, Defendant asserts that "[b]ecause the Complaint does not allege a taking of a reversionary interest or a right to royalties, the Complaint filed by Plaintiffs must be dismissed." (Def. Reply at 18). This ignores that Plaintiffs contend that their ownership in the Property could comprise no less than a reversionary interest/right to receive royalties but that even this property interest is sufficient to withstand a motion to dismiss. Moreover, to the extent necessary to secure the just determination of this action, if deemed necessary by the Court, Plaintiffs could be granted leave to amend their Complaint, which leave would be freely given when justice so requires. RCFC 1, 15(a).

## CONCLUSION

The parties agree that the Decision prevents Plaintiffs from mining at least a portion of their property. Moreover, Plaintiffs have presented sufficient competent, admissible that "the designation by OSM of unsuitability within the Rock Creek watershed boundary essentially eliminates the viability of mining the **entire** Wharton tract." (Declaration of Marcus Wiley, attached to Appendix hereto, as Exhibit "1" at ¶14) (emphasis added). It would accordingly be futile for Plaintiffs to apply for a mining permit. Plaintiffs' claims are ripe for adjudication.

The Court should not revisit the legal conclusions it established for claims accrual purposes. The facts surrounding notice to Santiago do not differ sufficiently from those facts involving notice to Benchmark to justify reaching a completely inapposite result for the statute of limitations as to Santiago.

Finally, even if Plaintiffs had no more than a right to receive royalty payments, or if Plaintiffs are viewed as mere lessors of the property, Plaintiffs nevertheless possess a valid, compensable property interest.

The court should deny the government's motion to dismiss/motion for summary judgment, and enter a new scheduling order so that the issues of whether a taking has occurred and the amount of damages caused thereby may be decided.

RESPECTFULLY SUBMITTED this 12th day of October, 2006.

**BENCHMARK RESOURCES CORPORATION,
GENTRY CORPORATION & SUNRISE HOLDING, INC.**

By: s/  James N. MacKinlay
James N. MacKinlay
1019 South Stapley
Mesa, Arizona  85204
Phone: (480) 898-9239
Fax: (480) 833-2175
Attorney of Record for Plaintiffs